AO 91 (Rev. 11/11) Criminal Complaint                    SFY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ERICK BUSTAMANTE,
RICK OWEN, and
JERY BARTON

CASE NUMBER:  A CR 733

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or about August 2017, and continuing until at least in or about May 2019, in the Northern District of Illinois, and elsewhere, the defendants, together with others known and unknown, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | conspiring to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, namely, the delivery of quantities of United States currency to third parties, which transactions involved the proceeds of specified unlawful activity, namely the felonious buying and selling and otherwise dealing in a controlled substance, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). |

This criminal complaint is based upon these facts:

   X  Continued on the attached sheet.

_____

Joseph A. Dinaso
Special Agent, DEA

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 20th day of September, 2019.

Date:_____

_____
*Judge's signature*

City and state: Chicago, Illinois

  JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

2

UNITED STATES DISTRICT COURT    )

                                      )

NORTHERN DISTRICT OF ILLINOIS   )

## AFFIDAVIT

I, Joseph Dinaso, being duly sworn, depose and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately September 2016. As such, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking offenses. I have received training and have experience in investigating violations of federal narcotics laws including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I have been involved in various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering, and conducting conspiracy and complex investigations. I have conducted and participated in investigations that have resulted in the seizure of controlled substances. I am familiar with, and have participated in all of the normal methods

of investigation, including but not limited to, visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of consensually recorded calls, text messages and meetings, the management and use of informants, and pen registers.

3. This affidavit is submitted in support of a criminal complaint alleging that ERICK BUSTAMANTE, RICK OWEN, and JERY BARTON have violated Title 18, United States Code, Section 1956(h) (conspiring to commit concealment money laundering). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging these individuals with money laundering, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers; (c) surveillance conducted by DEA agents and other law enforcement officers; (d) analyses of toll records, pen register and trap and trace data, and subscriber information; (e) information derived from court-authorized interceptions of wire and electronic communications;[1] (g) emails obtained through the

---

[1] On March 26, 2019, May 1, 2019, June 6, 2019, July 22, 2019, and August 22, 2019, the Chief Judge of the Northern District of Illinois signed orders authorizing – at various times and in various combinations – the interception of wire and electronic communications to and from Target Phone 7 and Target Phone 9 (used by BUSTAMANTE), and the interception of wire communications to and from Target Phone 8 (used by OWEN).

execution of a court-authorized search warrant; (h) bank records; (i) my training and experience and the training and experience of other law enforcement agents with whom I have spoken; (k) commercial database records; and (n) information provided by cooperating sources and other individuals.

## II. FACTS SUPPORTING PROBABLE CAUSE

5. DEA and IRS agents have obtained evidence that ERICK BUSTAMANTE, RICK OWEN, and JERY BARTON are members of a money laundering organization (the "BUSTAMANTE MLO") that has, since no later than August 2017, laundered approximately $4,356,909 in narcotics proceeds on behalf of Mexico-based narcotics traffickers and their associates throughout the United States, including a Chicago-based drug trafficking organization. As discussed below, the BUSTAMANTE MLO has collected bulk currency narcotics proceeds from multiple money couriers and drug traffickers throughout the United States; deposited the bulk currency into bank accounts controlled by the BUSTAMANTE MLO; and then transferred those proceeds to other accounts controlled by the MLO or the drug money owners, as directed by the true owners of the proceeds. The investigation has revealed that:

a. BUSTAMANTE is the California-based leader of the BUSTAMANTE MLO. Among other things, BUSTAMANTE (i) negotiated agreements to launder narcotics proceeds belonging to Mexico-based drug traffickers, from various locations in the United States; (ii) collected narcotics proceeds, in keeping with those agreements, from multiple money couriers and drug traffickers throughout the United States; (iii) deposited those illicit proceeds into bank accounts

3

controlled by the BUSTAMANTE MLO, and brought illicit proceeds to wire transfer service locations, for purposes of laundering the money; (iv) directed BARTON, CS2, UC3, and others to accept deposits of illicit proceeds into bank accounts and quickly transfer those proceeds to other accounts controlled by the MLO; and (v) fabricated false but facially legitimate sources and documentation for these illicit proceeds to conceal the true nature, source, and owners of the money.

b. RICK OWEN is a California-based member of the BUSTAMANTE MLO. Among other things, OWEN (i) assisted BUSTAMANTE in finding narcotics traffickers and other illicit proceeds owners who were willing to pay the BUSTAMANTE MLO to launder their illicit proceeds; (ii) recruited individuals, including CS2, with corporate bank accounts, through which the BUSTAMANTE MLO laundered illicit proceeds; and (iii) helped BUSTAMANTE make travel arrangements to collect and launder narcotics proceeds throughout the United States.

c. JERY BARTON is an Ohio-based member of the BUSTAMANTE MLO. Among other things, BARTON acted as a "paymaster" for the MLO, meaning that he, at the direction of BUSTAMANTE and others, (i) opened bank accounts at multiple financial institutions, including Huntington Bank and Bank of America; (ii) allowed other members of the BUSTAMANTE MLO to deposit what he knew to be illicit proceeds into those accounts; and (iii) then transferred those illicit proceeds from his bank accounts to other accounts designated by BUSTAMANTE and the drug money owners.

4

6. Specifically, and as discussed in greater detail below:

a. The BUSTAMANTE MLO has conducted numerous money pick-ups, bank deposits and transfers, and other financial transactions consistent with the aforementioned money laundering techniques used by United States-based money laundering organizations. (*See* ¶¶ 7-8).

b. On or about August 30, 2017, BUSTAMANTE traveled to Chicago, at the request of a Mexico-based source of narcotics supply, to supervise and coordinate the repayment of money that a Chicago-based DTO owed the supplier following law enforcement's seizure of approximately 11 kilograms of heroin. (*See* ¶¶ 9-11).

c. Between approximately August 2017 and March 2019, BUSTAMANTE, OWEN, and their associates used Company A Bank Account 1, controlled by an individual who later became a confidential source ("CS2"),[2] to

---

[2] CS2 has been cooperating with law enforcement since January 2019. CS2 has no pending charges and no prior convictions. CS2 is cooperating in the hope of receiving consideration at sentencing on possible charges arising from his involvement in the BUSTAMANTE money laundering conspiracy, but no promises have been made to CS2. CS2 was provided approximately $2,250 for the purpose of flying to Chicago to meet with agents. The information provided by CS2 during this investigation has proven reliable. CS2's information has been corroborated through bank records and toll activity confirming the activity reported by CS2, information provided by CS1, and consensually recorded calls and meetings involving, at different times BUSTAMANTE, CS2, and undercover agents. Through information provided by CS2, physical surveillance and court authorized geo-location information for Target Phone 7, agents became aware that, on March 1, 2019, BUSTAMANTE had met with an unknown individual in North Carolina to obtain approximately $250,000 in currency and, on March 2, 2019, transported it to Atlanta, where BUSTAMANTE deposited it into a Chase bank account. At the time, CS2 stated to agents that the money had not been deposited to Company A Bank Account 1. On or about March 7, 2019, through consensually-monitored WhatsApp communications between CS2 and Lalo, agents became aware that the money had been deposited to Company A Bank Account 1, and that CS2 had been aware of the deposit. Agents confronted CS2, who admitted to the misrepresentation, admitted that two deposits had been made to Company A Bank

launder over $2.9 Million in narcotics proceeds, including money belonging to a drug trafficker named "Lalo." BUSTAMANTE and his associates made substantial cash deposits to Company A Bank Account 1, in amounts ranging from approximately $4,000 to approximately $313,500 per transaction. BUSTAMANTE and his associates then instructed CS2 to transfer almost all of those amounts out of Company A Bank Account 1 to various individuals. (*See* ¶¶ 12-13).

      d.      On or about January 30, 2019, BUSTAMANTE met with and recruited two undercover DEA agents posing as pilots ("UC1" and "UC2") to fly kilogram quantities of narcotics and narcotics proceeds internationally on behalf of BUSTAMANTE, OWEN, and Mexico-based drug traffickers. During this recorded meeting, BUSTAMANTE advised UC1 and UC2 that (i) the amounts of narcotics proceeds that he launders are so large that, rather than count money bill by bill, he and his coconspirators count the money "by weight," with "every million in a hundred dollars" weighing "22.4 pounds"; (ii) he had previously arranged for the transport of $75 million in narcotics proceeds using a G3 jet; (iii) he discussed the transport of "500 kilos of white," meaning 500 kilograms of cocaine; (iv) he discussed using Company A Bank Account 1 to "filter" (launder) the narcotics proceeds; (v) he asked

---

Account 1, and subsequently sent agents documentation of that activity. CS2 was admonished and agreed to provide full, complete, and truthful information. The information provided by CS2 during this investigation has otherwise proven reliable as described above. CS2 provided agents with a photograph of BUSTAMANTE's California state identification card. Agents compared the photograph of the man depicted on the driver's license provided by CS2 to the state photo identification card that agents had previously located in August 2017, based on information provided by CS1 and BUSTAMANTE's flight information. Based on that comparison, agents identified BUSTAMANTE as the man who, according to CS2, directed CS2 to move narcotics proceeds through Company A Bank Account 1.

UC1 and UC2 how much they would charge him to fly kilogram quantities of narcotics and narcotics proceeds on behalf of BUSTAMANTE and one or more Mexico-based drug suppliers; and (vi) explained that the pilots' payment for transporting narcotics or narcotics proceeds would be deposited into Company A Bank Account 1, from which CS2 would transfer the payment to UC1 and UC2. (*See* ¶¶ 14-25).

      e.    In numerous intercepted calls, BUSTAMANTE, OWEN, and BARTON identified a man they knew as "Lalo" as an associate of Mexico-Based narcotics traffickers and the owner of proceeds that they laundered. (*See* ¶¶ 26-37).

      f.    Between August 2017 and May 2019, BUSTAMANTE, OWEN, and BARTON used at least five different bank accounts controlled by BARTON to launder approximately $836,019 in illicit proceeds on behalf of narcotics traffickers, including Lalo, and others. The BUSTAMANTE MLO used these bank accounts to accept deposits of narcotics proceeds and shortly thereafter transfer them to other accounts. During several intercepted calls, BUSTAMANTE, OWEN, and BARTON discussed the true nature of these proceeds and the need to fabricate fictitious and putatively legitimate sources for the money, in order to avoid detection by bank management, bank regulators, and law enforcement.

      g.    Between on or about April 15, 2019, and May 17, 2019, BUSTAMANTE and OWEN collected approximately $416,920 in narcotics proceeds and laundered approximately $405,980 through two Chicago-based companies. BUSTAMANTE collected those proceeds from various money couriers and drug traffickers in Kentucky, Ohio, Illinois, and Alabama, and attempted to collect

7

approximately $101,000 from another narcotics trafficker in Tennessee. On behalf of himself and the other members of his MLO (including OWEN), BUSTAMANTE deposited (i) approximately $311,980 of those proceeds at a wire transfer business in Chicago ("Wire Transfer Business A") in four installments on April 15, 2019, May 2, 2019, May 7, 2019, and May 17, 2019; and (ii) on April 17, 2019, approximately $94,000 into a bank account controlled by an undercover agent (UC3) posing as a West Chicago-based business man willing to allow the MLO to launder funds through his corporate bank account.

## A. Background of Money Laundering and Drug Trafficking Organizations

7. Through training, experience, law enforcement training publications about money laundering methods, and from my conversations with confidential sources and other law enforcement officers who have expertise in such matters, I am familiar with the methods by which drug traffickers utilize the purchase of gold to launder drug proceeds. For example, I know that:

a. There are numerous money laundering and drug trafficking organizations operating in the country of Mexico. Examples of some of these organizations include the Sinaloa Cartel, La Familia Cartel, Knights Templar Cartel, Juarez Cartel, the Gulf Cartel, and the Jalisco New Generation Cartel. As a general rule, these Mexico-based organizations purchase South American processed cocaine which is transshipped through Mexico and smuggled into the United States. These organizations also grow, cultivate, cook and process heroin, methamphetamine, and marijuana in Mexico and subsequently smuggle the controlled substances into the

United States for resale. The sale of these controlled substances generates substantial cash proceeds for these drug and money laundering organizations, which cash represents the cost of goods sold and illegal profits.

b. After the sale of controlled substances, the proceeds from the sales must be collected, counted, packaged and delivered in some fashion to the Mexican-based drug trafficking organizations ("DTOs"). At times, these funds are transported or transferred in one way or another to Mexico. This can occur through a variety of techniques.

c. Typically, DTOs smuggle drug proceeds in bulk from the United States to Mexico. However, because bulk smuggling is often considered more risky due in part to seizures of drug proceeds at border areas, more sophisticated DTOs rely on more complex money laundering schemes. Those schemes include trade-based money laundering (such as trading in goods and precious metals) and layered financial transactions through the banking system.

d. DTOs use different money laundering cells in the United States to facilitate laundering their drug proceeds. These cells perform different functions, including money pickup operations, bulk cash smuggling operations, operations involving the purchase of goods, and cash deposits into MLO- and DTO-controlled bank accounts.

e. The basic money laundering process has three steps. The first step occurs when the DTO arranges to deposit or drop off the drug proceeds in the

9

United States. At this stage, launderers sometimes insert the drug proceeds, or "dirty money," into a legitimate financial institution in the form of cash bank deposits.

   f.  One of the most common money laundering practices for DTOs is to direct drug traffickers and money couriers to deliver drug proceeds to money launderers in what is referred to as a "money pickup." In a typical money pickup, the DTO-associated broker arranges for a U.S.-based co-conspirator to meet an individual in possession of a large quantity of narcotics proceeds. To arrange the meeting, the money broker typically provides the U.S.-based conspirator a telephone number to call, and a code phrase or a serial number from a dollar bill to say to the individual who answers the telephone call. The code phrase and serial number are means for those who are exchanging the narcotics proceeds to confirm that both parties are executing a previously agreed upon money contract between the money broker and the DTO.

   g.  The second step in the process is referred to as layering. For those DTOs who use the formal banking system, they send the drug proceeds through various financial transactions to change the form of the money in order to make it difficult to trace its origin. Layering may consist of several bank-to-bank transfers, wire transfers between different accounts in different names in different countries, and making deposits and withdrawals to continually vary the amount of money in the accounts.

   h.  The final step is the integration stage, when the now-laundered money re-enters the mainstream economy and appears as though it originated from

a legal transaction. This step may involve a final bank transfer into the account of a business in which the launderer "invests" the narcotics proceeds that moved through one or more prior bank accounts during the layering stage, or uses the money to purchase of an overvalued item from a company owned by the launderer.

8.       As discussed below, the BUSTAMANTE MLO has conducted numerous money pick-ups, bank deposits and transfers, and other financial transactions consistent with the aforementioned money laundering techniques used by United States-based money laundering organizations.

**B.      BUSTAMANTE Coordinates Chicago-Based DTO's Repayment of Money Owed for 11 Kilograms of Heroin Supplied by a Mexico Source of Supply (August 30, 2017)**

9.       On or about August 19, 2017, DEA agents seized approximately 11 kilograms of heroin from Silvano Hernandez Sanchez ("Hernandez"), who was later charged in the Northern District of Illinois (Case No. 18 CR 524) with possession with intent to distribute heroin.

10.      Following the seizure of the heroin from Hernandez on August 19, 2017, a confidential source, "CS1,"[3] advised agents that on or about August 30, 2017, an

_____

[3] CS1 has provided information to the Chicago Police Department relating to several criminal investigations, in exchange for payment. CS1 has been paid approximately $43,900 over the course of the past approximately seven years for providing information to the Chicago Police Department and the Drug Enforcement Administration. CS1 is currently a Drug Enforcement Administration Confidential Source. CS1 has no prior convictions. The information provided by CS1 to the Chicago Police Department and the Drug Enforcement Administration over the past approximately seven years have been proven reliable and has led to, among other things, the successful apprehension of more than six individuals in the Chicago-land area, and the seizure of multiple kilograms of narcotics. CS1 began providing DEA agents information in this investigation in approximately June 2017. In this case, the information provided by CS1 has been corroborated by independent evidence, including

11

unknown individual, later identified as Erick BUSTAMANTE,[4] was sent by the Mexico source of supply to meet with members of a Chicago based drug trafficking organization led by Juan Martinez Cruz (the "Martinez DTO")[5] and to supervise their repayment to the Mexican source of supply for the seized heroin. According to CS1, BUSTAMANTE informed CS1, Martinez, and other DTO members that they were required to pay the Mexican source of supply $118,000 per person to pay off the drug shipment that was seized. According to CS1, BUSTAMANTE provided them with a bank account and routing number to which the payments were to be made. According to CS1, BUSTAMANTE provided CS1 and Hernandez's other associates with a bank account and routing number ("Company A Bank Account 1") and directed them to deposit payments for the seized heroin into that account.

11. Based on my training, experience, and familiarity with this case – including the seizure of 11 kilograms of heroin from a member of the Chicago-based DTO, information from CS1 and later CS2, travel records confirming BUSTAMANTE's travel to Chicago at the time in question, bank records showing deposits into Company A Bank Account 1, and subsequent consensually recorded and

---

surveillance, toll records, consensually recorded phone calls, and the seizure of narcotics, and has led to the arrest of one of the Chicago-based DTO members.

[4] Agents identified BUSTAMANTE as follows: According to CS1, BUSTAMANTE provided CS1 with his flight information, which CS1 in turn provided to investigating agents. A Facebook search of BUSTAMANTE's telephone number showed a profile registered to "Erick BUSTAMANTE" that contained photographs. CS1 identified the individual pictured in the profile page as the same individual with whom CS1 met. According to information obtained from O'Hare International Airport, Erick BUSTAMANTE flew from Los Angeles, California, to Chicago on an airline ticket that was purchased by Individual A, of Mexico City, Mexico.

[5] On August 23, 2018, Martinez Cruz was indicted in the Northern District of California (Case No. 18 CR 460) for possession with intent to distribute heroin and cocaine.

lawfully intercepted calls and meetings between BUSTAMANTE and others regarding other financial transactions involving narcotics proceeds – I believe that (a) members of the Chicago-based DTO and the BUSTAMANTE MLO deposited approximately $2,934,910 into Company A Bank Account 1, part of which constituted repayment to a Mexico-based drug trafficker who had previously supplied the DTO approximately 11 kilograms of heroin that was later seized by agents; (b) the Chicago-based DTO made those deposits into Company A Bank Account 1 at the direction of BUSTAMANTE; and (c) BUSTAMANTE directed the Chicago-based DTO to deposit that money into Company A Bank Account 1 for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

### C. BUSTAMANTE MLO Used Company A Bank Account 1 to Launder Over $2.6 Million in Narcotics Proceeds between August 2017 and February 2019

12. According to Chase Bank records, Company A Bank Account 1 was opened in approximately October 2014, was held in the name of "Company A," and listed CS2 as a signatory. Bank records for Company A Bank Account 1 documented a high volume of cash deposits, beginning in August 2017, and increasing in November 2017. In November 2017, hundreds of thousands of dollars in cash were deposited in the account and were transferred to other bank accounts within 7 days. According to bank records of Company A Bank Account 1, between August 30, 2017 and March 5, 2019, there were at least 41 currency deposits made totaling $2,934,910.

13. In January 2019, CS2 agreed to cooperate with law enforcement. According to CS2:

     a.     CS2 began laundering narcotics proceeds for BUSTAMANTE[6] through Company A Bank Account 1 in or about early 2016.

     b.     One of CS2's business associates, Rick OWEN, introduced CS2 to BUSTAMANTE in or about early 2016. Through a series of phone calls and emails, BUSTAMANTE initially told CS2, who worked in the oil-refinery industry, that he (BUSTAMANTE) had investors who were interested in purchasing refinery-related equipment through CS2's oil refinery contracting company ("Company A"). CS2 provided BUSTAMANTE with a list of CS2's vendors and inventory list from previous jobs and began receiving deposits of various amounts into Company A Bank Account 1 from BUSTAMANTE and his associates.

     c.     After CS2 received the deposits from BUSTAMANTE's associates, BUSTAMANTE provided invoices to CS2 in amounts equal to the deposits. BUSTAMANTE advised CS2 when deposits into Company A Bank Account 1 were made, and BUSTAMANTE and other members of the BUSTAMANTE MLO, including OWEN and INDIVIDUAL A, instructed CS2 to transfer the invoiced amounts to other bank accounts identified on the invoices.

     d.     In approximately January 2018, CS2 began to suspect that the money that BUSTAMANTE was moving through Company A Bank Account 1 was proceeds from the sale of narcotics. Two months earlier, in approximately November

---

[6] CS2 provided agents with a photograph of BUSTAMANTE's California state identification card. Agents compared the photograph of the man depicted on the driver's license provided by CS2 to the state photo identification card that agents had previously located in August 2017, based on information provided by CS1 and BUSTAMANTE's flight information. Based on that comparison, agents identified BUSTAMANTE as the man who, according to CS2, directed CS2 to move narcotics proceeds through Company A Bank Account 1.

2017, one of BUSTAMANTE's associates deposited approximately $313,000 into Company A Bank Account 1. BUSTAMANTE did not provide an invoice related to that deposit, but he still instructed CS2 to transfer the money to another bank account. Approximately one to two months later, by no later approximately January 2018, an individual who introduced himself to CS2 as "Lalo" contacted CS2, accused CS2 of stealing his and his associates' money, and threatened to physically harm CS2. The stolen amount was approximately $1.8 million, of which it was determined that Individual A was responsible for approximately $1.5 million, and BUSTAMANTE was responsible for approximately $300,000. In a subsequent call, BUSTAMANTE told CS2 that he had stolen money from Lalo and that, in order to repay Lalo and his associates, BUSTAMANTE would do "pick-ups" and "drop-offs" on their behalf. CS2 understood BUSTAMANTE to mean that BUSTAMANTE agreed to pick up and drop off narcotics proceeds at the direction of Lalo and his associates. By the time of this call, CS2 suspected that the money that BUSTAMANTE was moving through Company A Bank Account 1 was narcotics proceeds.

   e. BUSTAMANTE arranged for unidentified individuals to deposit narcotics proceeds into Company A Bank Account 1, and used Target Phone 7 to discuss with CS2 the transfer and movement of the narcotics proceeds through that account.[7] After each deposit, BUSTAMANTE sent CS2 text messages and

---

[7] Toll records for Target Phone 7 show that Target Phone 7 was in contact with CS2's phone between December 27, 2018 and February 27, 2019.

15

photographs of the deposit receipts from Target Phone 7.[8] After the proceeds entered

Company A Bank Account 1, BUSTAMANTE instructed CS2 to transfer those funds,

in amounts that BUSTAMANTE specified, to other individuals and accounts that

BUSTAMANTE identified. For example, on January 24, 2019, BUSTAMANTE used

Target Phone 7 to inform CS2 via text message that money deposits had been made

to Company A Bank Account 1 (in the respective amounts of $127,000, $80,000,

$62,855, and $66,500).[9] CS2 was subsequently instructed to move that money to other

accounts by Lalo and other unknown individuals. Company A Bank Account 1 did in

fact receive these money transfers as BUSTAMANTE promised.[10]

      f.     OWEN[11] and Individual A were members of the BUSTAMANTE

MLO working with BUSTAMANTE. OWEN and Individual A occasionally instructed

CS2 where to transfer funds deposited into Company A Bank Account 1 on behalf of

the BUSTAMANTE MLO.

---

[8] CS2 provided these texts and photographs from Target Phone 7 to agents. CS2 also accessed a website for Company A Bank Account 1 under the supervision of agents, and obtained through the website bank statements reflecting the transactions, which CS2 provided to agent.

[9] CS2 provided agents with these text messages from Target Phone 7.

[10] CS2 provided agents with bank statements for Company A Bank Account 1 to corroborate these deposits.

[11] CS2 provided agents with a screen shot of a WhatsApp conversation between CS2 and the user of Owen Phone 1. In the screenshot, the user of Owen Phone 1 is identified by the photograph of a man, which appeared next to the username "Ricky Owen." Agents compared the photograph of the user of Owen Phone 1 to a driver's license photo of OWEN maintained by the California DMV and, based on that comparison, identified OWEN as the user of Owen Phone 1 and as the man who, according to CS2, helped recruit CS2 into the BUSTAMANTE MLO and who occasionally directed CS2 to move narcotics proceeds on behalf of the MLO.

16

g. Several times in their discussions, BUSTAMANTE stated that he had the need for airplane pilots willing to make international trips to transport cash from Mexico to a number of destinations, including Colombia. CS2 understood BUSTAMANTE to mean that he wanted pilots who would transport bulk United States currency that belonged to Mexico-based narcotics suppliers from one country to another, via aircraft.

h. Of the approximately 41 currency deposits made into Company A Bank Account 1 between August 1, 2017 and February 28, 2019, only nine, totaling $9,350, belonged to CS2. BUSTAMANTE and his associates were responsible for the remaining 32 deposits, totaling approximately $2,661,050.

**D. BUSTAMANTE and OWEN Recruit Undercover DEA Agents to Fly Large Quantities of Narcotics and Narcotics Proceeds (January 2019)**

14. According to CS2, on or about January 29, 2019, CS2 had a call with BUSTAMANTE, who was using Target Phone 7.[12] This call was not recorded, but it was verified by toll records. According to CS2, during this call and at the direction of agents, CS2 told BUSTAMANTE that he/she knew of pilots that may be willing to

---

[12] Agents identified BUSTAMANTE as the user of Target Phone 7 as follows: Prior to the January 30 meeting described below, CS2 had multiple consensually recorded calls with the user of Target Phone 7, whom CS2 identified as BUSTAMANTE, in which the user of Target Phone 7 made arrangements to meet the two UCs at the Sugar Land Regional Airport in Houston. Surveillance agents subsequently observed BUSTAMANTE arrive and meet with the UCs at the designated time of this meeting, and geo-location information placed Target Phone 7 in the vicinity of that meeting. Agents compared the recording of that in-person meeting with BUSTAMANTE to the recordings of CS2's calls with the user of Target Phone 7 and, based on that comparison, determined that BUSTAMANTE is the user of Target Phone 7. Also, as discussed above, CS2 identified BUSTAMANTE as the user of Target Phone 7, and provided agents with several text message exchanges with the user of Target Phone 7 regarding the movement of money through Company A Bank Account 1.

17

transport bulk currency internationally for him, and that they would be in the Houston area. BUSTAMANTE told CS2 that he was currently located near Houston, Texas, and would meet the pilots. CS2 understood BUSTAMANTE to be very eager to meet the pilots to discuss specifics about the potential trip.

15. According to CS2, on or about January 29, 2019, CS2 had a call with BUSTAMANTE, who was using Target Phone 7. This call was not recorded, but it was verified by toll records. According to CS2, during this call and at the direction of agents, CS2 told BUSTAMANTE that the pilots that CS2 had previously mentioned would be in the area of Houston in the afternoon of January 30, 2019.

16. On January 29, 2019, CS2 had a consensually recorded call with BUSTAMANTE, who was using Target Phone 7.[13] During this call,[14] CS2 discussed

---

[13] Agents identified BUSTAMANTE as the user of Target Phone 7 as follows: Prior to the January 30 meeting, CS2 had multiple consensually recorded calls with the user of Target Phone 7, whom CS2 identified as BUSTAMANTE, in which the user of Target Phone 7 made arrangements to meet the two UCs at the Sugar Land Regional Airport in Houston. Surveillance agents subsequently observed BUSTAMANTE arrive and meet with the UCs at the designated time of this meeting, and geo-location information placed Target Phone 7 in the vicinity of that meeting. Agents compared the recording of that in-person meeting with BUSTAMANTE to the recordings of CS2's calls with the user of Target Phone 7 and, based on that comparison, determined that BUSTAMANTE is the user of Target Phone 7. Also, as discussed above, CS2 identified BUSTAMANTE as the user of Target Phone 7, and provided agents with several text message exchanges with the user of Target Phone 7 regarding the movement of money through Company A Bank Account 1.

[14] Some of the recorded conversations and captured text messages ("recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and in central time, unless otherwise noted. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from CS1, CS2, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of

18

the next day's meeting with the pilots. CS2 stated, "Well, let me ask you this question. If pilots guys come and you get organized on that [if BUSTAMANTE arranges for the pilots to transport currency], how quick will them guys [the DTO] be ready to wire for the pilot guys [set up a payment to the undercover pilots from Company A Bank Account 1]?" BUSTAMANTE responded, "Oh they've [the Mexico DTO has] been waiting for you. As soon as you tell me, they are going to go ahead and launch it to your [Company A] account [the Mexico DTO will deposit money to Company A Bank Account 1 to provide for payment to the pilots]."

17.     On January 30, 2019, at approximately 11:51 a.m., BUSTAMANTE, who was using Target Phone 7, had a consensually recorded phone call with CS2. During the call, CS2 stated, "Head over to the Sugar Land Airport, and I will send you the address." BUSTAMANTE stated, "They want me to go to Sugar Land Airport." CS2 stated, "Yeah, yeah I'll send you the address." BUSTAMANTE replied, "Ok that's fine."

18.     At approximately 1:23 p.m., surveillance observed BUSTAMANTE and another man who was later identified arrive in the parking lot of the Sugar Land Regional Airport. Surveillance observed BUSTAMANTE greet UC1 and UC2 by shaking hands and sitting at a table with them outside the airport. Prior to this meeting, UC2 was outfitted with a concealed video/audio recording device. In the

---

other law enforcement agents in this investigation. Some of the recorded conversations contained herein are in the Spanish language. For these conversations, I have relied on draft – not final – English translations of conversations in Spanish done by DEA agents and/or interpreters contracted by DEA.

beginning of their meeting, the recording device did not capture all of the conversation because of background noise. Approximately two minutes after meeting each other, surveillance observed the four men walk toward an undercover DEA aircraft. According to UC1, as they were walking toward the aircraft, BUSTAMANTE told UC1 that he was attempting to locate pilots that were willing to move a large amount of United States currency from the Dominican Republic to Honduras. Once at the aircraft, UC2's recording device captured the following conversation:

a.      BUSTAMANTE stated, "[CS2] said I could talk very openly with you so that helps a lot." Later during the conversations, UC1 stated, "So you're looking [for us] to fly somebody else's planes." BUSTAMANTE stated, "That's the first option, but obviously you guys handle your own logistics a lot better than anyone else. So, it would be just depending on how you guys want to set up the dynamic of the relationship."

b.      UC1 stated, "So talk to me about compensation, what are we looking to pay." BUSTAMANTE stated, "That's what I need to know from you guys, to even just go and spot everything out and do the inspection, uh, what is your, what is your deposit." UC1 stated, "So, the first run [flight] you're talking about just doing [transporting] like, bulk – bulk currency, right, is that what we're talking about?" BUSTAMANTE stated, "Pretty much." UC1 stated, "Ok, alright. No other natural textiles [narcotics] [U/I]." BUSTAMANTE laughed and stated, "Well, if, if they [the Mexico-based drug trafficking organization] were to switch it [from currency to narcotics], what would be the option there?" UC1 responded, "Well, that's where we

need, I mean, you know price depends on..." BUSTAMANTE stated, "Right, so let's say you're carrying, um, 500 kilos [of narcotics], what would that be?" UC1 responded, "Well, um, you know 500... we're probably looking at probably on the high side, probably around 250 [the pilots would charge $250,000 the transport 500 kilos of narcotics]." BUSTAMANTE asked, "250,000 per flight? Ok." UC1 stated, "That's not using our plane, aright. That's just us."

     c.    UC1 stated, "[CS2] deals with our boss and then we kind of, he's kind of the intermediary, so, um, what we'd be looking to do is have some kind of a, you know like a good faith transfer [payment, or transfer of funds, to the pilots] first before that." BUSTAMANTE stated, "Right, we actually, what we do is that we do 75% of the trip [we transfer 75% of the cost of the transport], uh, over to [Company A] which is [CS2's] company and then [CS2's] company deposits it directly to you guys." UC1 stated, "Ok, alright. Um, ok."

     d.    UC2 asked, "How would they, would they [the Mexico-based drug trafficking organization] entertain us using our own plane?" BUSTAMANTE stated, "I can put them [the Mexico-based drug trafficking organization] on the phone now, do you mind if I do?" UC2 stated, "No, go ahead, ok."

    19.    Subsequently, BUSTAMANTE, using Target Phone 7, placed a call to Armando HERNANDEZ-Marquez ("Marquez"), who was using Marquez Phone 1.[15] UC2's concealed recording device captured both sides of this call. During this call:

---

[15] Marquez was identified as the user of Marquez Phone 1 as follows: at the time of this call, UC2 observed that BUSTAMANTE had called a phone number associated with the contact name "Armando," which is Marquez's first name. Toll records for Target Phone 7 show that, at the same time that the UCs observed BUSTAMANTE speaking on this phone call, Target

     a.    Speaking to Marquez over Target Phone 7, BUSTAMANTE stated, "[L]et's say that we do 500 units [500 kilograms of narcotics] using your [Marquez's] plane, it's, ah, estimate about 250 [the pilots would charge us about $250,000]. So we would have to send the deposit over to [CS2], [CS2] would go ahead and pay that and you [Marquez] schedule out everything. But they [the pilots] need to go there and inspect the airplane and everything else so you can make sure you have the exit and the entrance covered [individuals working for the Mexico-based drug supplier at the airports ensure that the narcotics or money are successfully transported], right? Ok, so then we also have the option from them [the pilots] using their planes. Is that an option for you guys [Marquez and his associates], for them to use their own plane?" Marquez responded, "Yes."[16]

     b.    BUSTAMANTE put the phone on speakerphone and stated, "Ok, let me introduce, ah, this is [Marquez on the phone]." Marquez stated, "How much is gonna cost to [U/I]…" UC1 stated, "I couldn't understand what he said." BUSTAMANTE stated, "If you [the UCs] were to use your own plane [to transport narcotics and narcotics proceeds] how much it would cost?" UC1 responded, "I won't charge you much beyond the hourly rate to operate, to operate the airplane but like,

---

Phone 7 was in contact with Marquez Phone 1. Subscriber information obtained by the service provider for Marquez Phone 1 identified the subscriber as Armando Hernandez Marquez. In addition, CS2 provided Marquez Phone 1 as the phone number he used to contact BUSTAMANTE's associate, "Armando." On May 16, 2019, Marquez was indicted in the Central District of California (8:19 CR 83) on charges including drug conspiracy, distribution of fentanyl, and possession with intent to distribute fentanyl.

[16] Although the call was not yet placed on speakerphone, the UC's covert recording device was able to capture partial audio of Marquez's response. Although it is muffled, agents believe they could hear Marquez's response.

something like this we are talking about $3,000 bucks an hour or so, and ya' know. That gets covered us going down, across [the border], and then back. . . . It's gonna be, ya know, it's not gonna add a whole lot to it but, we are talking maybe another 50 [$50,000] total, for getting the plane."

     c.    BUSTAMANTE stated, "They, they, you know, like there, there is the terminology the 'burnt phone' [disposable phones used for a limited time to avoid detection by law enforcement].' . . . They [Mexico-based drug trafficking organization] use a lot of 'burnt planes,' so just one time use [of the plane to transport narcotics or narcotics proceeds] and that's it."

     d.    Marquez stated, "So last I heard [CS2] got all, all the bills [narcotics proceeds] they (U/I) through [CS2] right?" BUSTAMANTE responded, "Yeah, that's [Company A Bank Account 1] gonna be our filter [through which they will launder the narcotics proceeds]." Marquez stated, "Ok, no problem. Faster. Ok, so I'll let you know as soon as we, actually waiting for, they, they [Mexico-based drug trafficking organization] call me and I let you know right away so we can go, ah, can go with...to [CS2]." BUSTAMANTE stated, "Ok, I will let you know what that deposit [what amount of money should be deposited to Company A Bank Account 1 for the purpose of paying the UCs] is and also the timing so we can meet up with you and do the walk through [the UCs would meet with airport employees to ensure their cooperation with the transport]."

20.    After BUSTAMANTE concluded the phone call with Marquez, the recorded conversation between BUSTAMANTE and the UCs continued. During this conversation:

a.    UC1 stated, "Well, just a question when we talk about 500 keys [kilograms of narcotics], we are talking about white [cocaine] not green stuff [marijuana], right?" BUSTAMANTE responded, "Mm-hmm [yes]. . . Yeah, so those are mostly 'T-shirts' or 'Textiles [kilograms of narcotics].' And then uh, currency is just, ya know 'Green.' . . . No pot [marijuana]."

b.    UC1 asked, "Would you actually be flying down and doing the money pickups and then transferring it to us or how do you do that?" BUSTAMANTE stated, "...the biggest one we could bring in was a G3 [model of jet that has a higher payload capacity]. Because the hangar space and like you said the runway. That used to allow us to do 75M [transport $75 million on a single occasion]. So we go by weight, so per every million in a hundred dollars you're talking about 22.4 pounds. So we estimate about that much. Ok, and what we normally do is we have one rep who is going to sign for the end account. So it's usually myself, you'll always see me with the client, then we take the package and secure it into the hangar so when you guys touch down it's just a thing of just putting everything in."

c.    UC1 asked, "When we talk about 500 keys, we're talking about what [U/I]?" BUSTAMANTE responded, "Yeah, so those [narcotics] are mostly [referred to as] 't-shirts' or 'textiles,' and then uh currency is just, you know, [called] 'green.'" UC1 responded, "Gotcha."

24

d.   UC1 asked, "When it's textiles [when we are transporting narcotics], right, instead of currency, when it's textiles, same thing goes, you're our passenger with that stuff?" BUSTAMANTE responded, "It'll be Armando [Marquez]."

e.   UC1 asked, "Alright, ah, what kind of time frame are you looking about? I know you talked about this Dom Rep to, ah, Honduras run [flying narcotics or narcotics proceeds from the Dominican Republic to Honduras]." BUSTAMANTE responded, "Maybe next week or so, we are just waiting on you guys [the UCs] to be cleared, so basically waiting on your schedule. . . . Yeah, the sooner you tell us, you know, we, the guy say, you know, just let him know when (U/I) they move the money, they send the money to [CS2 and Company A Bank Account 1]."

21.   Based my training, experience, and familiarity with this case – including prior and subsequent consensually recorded calls between BUSTAMANTE and CS2; information from the UCs, CS1, and CS2; the prior seizure of kilogram quantities of heroin from Hernandez; and Company A Bank Account 1 records – I believe that, during the aforementioned meeting, BUSTAMANTE (a) stated that he launders such large quantities of narcotics proceeds that he counts the money by its weight rather than counting bill by bill; (b) stated that he previously used a plane with a payload capacity that allowed him to transport $75 million per flight; (c) recruited the UCs to fly narcotics proceeds and kilogram quantities of narcotics to various destinations outside and inside the United States on behalf of a Mexico-based drug supplier; (d) arranged with Marquez to transport 500 kilograms of cocaine as well as narcotics proceeds; and (e) BUSTAMANTE and Marquez agreed to pay the

25

pilots $250,000 for an international flight carrying up to 500 kilos of narcotics if they used a DTO plane, and $300,000, if they used their own plane; and (f) Marquez would travel with narcotics and BUSTAMANTE would travel with narcotics proceeds.

22.     On January 30, 2019, at approximately 2:01 p.m. (Consensual Session 86), OWEN, using Target Phone 8,[17] spoke with CS2 about the pilots. During this call:

a.     OWEN stated, "[I] knew Erick [BUSTAMANTE] was going with the pilots [UC1 and UC2], but a..." CS2 responded, "Well he is there with the pilot and co-pilot, so it's up to him if he can get that closed [arrange for pilots to air transport bulk currency narcotics proceeds]." OWEN stated, "No they [Mexico-based source of supply] wanted to wire the money [for the pilots travel] today for that." OWEN stated, "So they are going to get him [BUSTAMANTE] the price [for the flights] right?" CS2 responded, "Yeah, they're going to give him the price [undercover pilots will quote BUSTAMANTE their price for flying bulk currency narcotics proceeds], then he [BUSTAMANTE] will just have to add for us [BUSTAMANTE will add an additional amount to the pilots' quotation as commission for CS2, OWEN, and BUSTAMANTE]."

---

[17] Agents identified OWEN as the user of Target Phone 8 as follows: according to phone records, Target Phone 8 is subscribed to a woman who shares the same last name as OWEN. OWEN has also identified himself as the user of Target Phone 8 during intercepted communications. For example, on April 4, 2019, at approximately 3:18 p.m., in an intercepted communication (TP7 Session 648), BUSTAMANTE, using Target Phone 7, placed an outgoing call to Target Phone 8. The user of Target Phone 8 answered the phone by stating, "Hi, this is Rick Owen." Additionally, CS2 stated that CS2 communicated with OWEN at Target Phone 8.

b.      OWEN later said, "Yeah so if they [Mexico-based source of supply] send out a wire today it will be here [in Company A Bank Account 1] tomorrow and active on Friday, right?" Later during the conversation, OWEN stated, "Yeah, yeah so I told him [BUSTAMANTE] to try and get [the wire transfer for the pilot payment] out today, and give the people [Mexico-based source of supply] a call and I'm sure he will, 'cause he [BUSTAMANTE] want this to happen too." OWEN later said, "[L]ike I said, I did my part on the two things I was supposed to do on, so you get yours with the pilot, so we're just waiting on him."

23.     On or about January 30, 2019, at approximately 6:43 p.m., CS2 had a consensually recorded call with OWEN, who was using Target Phone 8. During this call, OWEN stated, "So this guy [Marquez, narcotics proceeds owner] is ready, right?" CS2 stated, "That's what Erick was saying." OWEN stated, "Well I just think we need to get a domestic flight thing done right now [to transport Marquez's narcotics proceeds]."

24.     On the same day, at approximately 8:50 p.m., CS2 had another consensually recorded call with OWEN, who was using Target Phone 8. During this call:

a.      CS2 stated, "Hey, you ever talk to Erick [BUSTAMANTE] on the pilot situation to see if you get any feedback?" OWEN responded, "He said because he got to talk to the other guy, 'cause uh, they [Mexico-based drug traffickers and BUSTAMANTE] just said, talked about them [the pilots] coming down there [to Mexico or another country], they didn't talk about doing a one-off in the US. So that's

27

what he's [BUSTAMANTE] got to get approved [I/A]. So I told them I think they [the pilots] just want to do a city to city [a domestic flight]. I don't know who they [the pilots] want to fly, they want to fly anybody right?"

        b.     CS2 asked OWEN if anyone would accompany the pilots, and OWEN stated, "Yeah I know it, absolutely, absolutely. Yeah I think uh, [Marquez] is gonna be uh, uh, yeah I guess [Marquez] gonna be there too so, yeah. Joe, I guess, another guy that comes back and forth over here so a couple guys are familiar with it and make sure everything's safe, so."

        25.     Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded calls and meetings between BUSTAMANTE, CS2, and the UCs; information from CS1 and CS2; the prior seizure of kilogram quantities of heroin from HERNANDEZ; and Company A Bank Account 1 bank records – I believe that, in the aforementioned calls, OWEN (a) acknowledged that BUSTAMANTE was recruiting pilots (UC1 and UC2) on his behalf to assist in the air transport of bulk currency narcotics proceeds; (b) stated that the pilots wanted to start with a flight transporting narcotics proceeds domestically; (c) advised that BUSTAMANTE needed to get the Mexico-based drug traffickers' approval for a solely domestic movement of narcotics proceeds; and (d) Marquez, an individual named "Joe," or both would accompany the pilots on the transport.

      **E.**     **BUSTAMANTE, OWEN, and BARTON Identify "Lalo" as a Mexico-Based Associate of Narcotics Traffickers.**

        26.     As discussed above, according to CS2, BUSTAMANTE and Individual A took approximately $1.8 million of narcotics proceeds from Lalo.

27. On numerous occasions between August 2017 and May 2019, BUSTAMANTE, OWEN, and BARTON laundered narcotics proceeds on behalf of Mexico-based trafficker of narcotics proceeds whom they referred to as "Lalo." In numerous intercepted calls, some of which are summarized below, BUSTAMANTE, OWEN, and BARTON discussed Lalo's unlawful occupation and the illicit source of the proceeds he paid them to launder.

28. For example, on or about March 1, 2019, BUSTAMANTE sent CS2 several communications, including 3 videos, several written messages, and a voice message, using the encrypted communication platform WhatsApp. CS2 provided these communications to law enforcement. One of the videos shows several duct-taped packages, each marked "50," which contained United States currency. In the videos, BUSTAMANTE[18] narrated, "So from the package where I grabbed the hundred, here are 2,000....two...wait, two hundred – two thousand, pardon me. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 here...it's 10." BUSTAMANTE said, "There are [$]2,000 missing here . . . . I'm going to open these now and I will let you know." In the WhatsApp voice message, BUSTAMANTE said, "Yes, Lalo, if they want me to meet with them, with my bag, with what they gave me...They can come to the room and look over whatever they want to look over....but, yeah...that package is not complete."

---

[18] BUSTAMANTE was identified as the speaker in this video as follows: CS2 advised that he received the communications from BUSTAMANTE, and UC3, who has spoken with BUSTAMANTE by phone and is familiar with his voice, recognized the voice in these communications as BUSTAMANTE.

29. Based on my training and experience, and knowledge of the investigation, including subsequent intercepted communications, I believe that these WhatsApp communications were directed at Lalo, and that BUSTAMANTE was recording videos of himself counting the narcotics proceeds that he had collected on Lalo's behalf. I believe that the purpose of the messages was to show Lalo that he had collected narcotics proceeds as instructed, but that those proceeds were $2,000 less than expected, and that BUSTAMANTE had not stolen the money.

30. On or about February 10, 2019, agents instructed CS2 that agents would be transitioning the funds in Company A Bank Account 1, which CS2 had used to launder money on behalf of the BUSTAMANTE MLO, to a bank account controlled by DEA. On or about May 13, 2019, at the direction of agents, CS2 withdrew the balance of Company A Bank Account 1, which totaled approximately $286,938. At the direction of law enforcement, CS2 transferred this balance to an account controlled by DEA ("DEA Bank Account"). After the funds were transferred, the bank placed a temporary hold on the funds, making them inaccessible.

31. On or about March 15, 2019, using WhatsApp, CS2 sent BUSTAMANTE a screenshot showing the balance in the DEA Bank Account. BUSTAMANTE observed the date the funds would be available and asked, "This says it [narcotics proceeds] won't be available until Friday the 21st. Is that correct???" BUSTAMANTE continued, "I'm going to get picked up by lalos people [DTO associates] and not in a nice way." According to CS2, shortly after these communications, BUSTAMANTE

30

called CS2 using WhatsApp and advised that Lalo's "people" [DTO members] picked BUSTAMANTE up and were taking him to see Lalo.

32.    On or about March 15, 2019, at approximately 5:48 p.m. (Consensual Session 1483), BUSTAMANTE, using Target Phone 7, spoke with CS2. During the conversation, BUSTAMANTE stated, "Hey man, we're gonna get to a quiet spot, I'm here with Lalo." BUSTAMANTE then stated, "And then, ah, and then we're basically make it work plans, so we can calm these assholes [Lalo and associates] down and make sure keep on moving forward this week [keep moving narcotics proceeds through the banking system]." CS2 responded, "Alright that works." BUSTAMANTE asked, "Do you think we'll have a clean account [a new account in order to deposit bulk sums of narcotics proceeds] this coming week[?]" BUSTAMANTE later stated, "Yeah, alright, look, I'm gonna be [with] Lalo, we're gonna talk and then we'll call you. Yeah."

33.    On or about May 11, 2019, at approximately 12:25 p.m. (TP7 Session 5916), BUSTAMANTE, using Target Phone 7, OWEN, using Target Phone 8, and BARTON spoke together on a 3-way call, during which they discussed a pending transfer of approximately $35,000 from an IOLTA account ending in 8708 held in the name of BARTON Law Firm LPA and controlled by BARTON ("Huntington IOLTA Account").[19] Specifically, BARTON advised BUSTAMANTE and OWEN, "The receipt

---

[19] Based on publicly available information, I know that IOLTA means Interest On Lawyer's Trust Account, which is a type of account into which attorneys place funds belonging to their clients. The interest from those funds is then contributed to programs to increase access to justice for low-income individuals.

that I sent you on the 35 [$35,000] going to the hair salon in the smaller city in Italy . . . was approved by me, but Huntington didn't send it out . . ." BUSTAMANTE noted that the receipt "says that the money is going to be sent out on Monday [May 13, 2019]" and "will be accredited by the 13th." OWEN said, "Yeah, it's not like it's a lot. It's a supply company. Like they do like all the chemicals and all the stuff from China over to Latin America." BARTON asked, "Okay, so it's a bona fide transaction as far as you know." BUSTAMANTE responded, "Yeah, it's for supplies. It's not like an actual salon." BARTON asked, "But is that a business that Lalo is in?" BUSTAMANTE answered, "Yeah, they do import and export. That's what they're main thing is, so they process payments for all kinds of merchants. So, some merchants will do hemp, like we've talked about before. Some companies do textiles, uh, some people do plastics or construction equipment...different things."

34. Based on my training and experience, and knowledge of the investigation, including prior and subsequent intercepted communications, and bank records for the Huntington IOLTA Account showing a wire transfer of approximately $34,800 to an Italian company on May 13, 2019, I believe that in this conversation, BARTON advised BUSTAMANTE and OWEN that he had initiated a transfer of approximately $35,000 out of the Huntington IOLTA Account, as directed, to a business entity recipient in Italy, even though he did not know the nature of the recipient's supposed business. OWEN and BUSTAMANTE stated that Lalo is associated with the business, and that they process proceeds from the sale of narcotics, including marijuana, which BUSTAMANTE described as "hemp," and

32

cocaine, which BUSTAMANTE described as "textiles," using the same word he used during the meeting with the UC pilots on January 30, 2019.

35.     On or about June 7, 2019, at approximately 7:40 p.m. (TP7 Session 7782), BUSTAMANTE, using Target Phone 7, had a phone call with OWEN, using Target Phone 8, to discuss the repayment of a debt to Lalo. BUSTAMANTE said, "You have no idea the attention that you guys are under because other guys have stolen half a million, 300 grand. It's a total of 2 million dollars that people have taken from Lalo's group. So, if he thinks he's gonna get away from not paying back the money, like, he really doesn't understand who these people are, man." Later, BUSTAMANTE said, "Right now I'm concentrating on everything else I'm doing but this is a pain in my ass because it has to deal with Lalo. So, I have to be his errand boy and his translator, I want to get rid of this guy, let's just pay him his fucking money. Get rid of him and then we never have to deal with anybody again[.]"

36.     On or about August 9, 2019, at approximately 11:41 a.m. (TP7 Session 15367), BUSTAMANTE, using Target Phone 7, had a phone call with BARTON, using Barton Phone 1. During the conversation, they discussed a method for laundering narcotics proceeds through the banking system, as they do for Lalo. During the conversation:

a.     BUSTAMANTE asked BARTON, "How can we get an account that we can process cash, but exit the money more than 48 hours, maximum 72 hours? What do we really need to develop an account like that?" BARTON responded, "You need to have a source of cash that will get a banker salivating," because "they're

gonna make money on it." BARTON further explained, "And it's gotta be on a place where they have some experience with those kind of arrangements. Which would be in one of the states where [u/i] Cannabis is legal, and has been legal for a while. So maybe Washington State. We are legal in Michigan now. Now, bankers are staying away from this type of arrangements because they just don't understand them. The compliance issue is straight forward. I can lay out the compliance issues for you, and we can see if there is a chance for success or not. I would try to set something like that up, if I [interruption] the compliance issues could be solved. You know what those issues are, it's origin of funds, NI-money laundering, NI-terrorist. No bribes involved, no foreign assets involved, it's by now a pretty long list."

      b.    BUSTAMANTE further explained, "This is all US, and we are talking about [$]300,000 at a time. So It's not gonna be in the millions, but what I'm looking for is to be able to deposit in any state that there is a branch for that particular bank, be able to process the funds, even if whatever fees we gotta pay. But be able to exit the funds within 48 hours, 72 hours. You know? Or at least half in 48 hours, then the rest the following day." BARTON said, "Okay, I understand that. Who are the [cannabis] growers in California using?" BUSTAMANTE responded, "There is a few banks, but they're still getting really regulated and some of the accounts keep on getting shut down. . . . [A]ll we need to do is, well technically not even mention the agricultural [narcotics] part, and that's what a lot of banks have been doing right now. They been doing a lot of underwriting for different type of projects. It just so

34

happens that the deposits happen to be in cash, but they're not reporting it as Cannabis."

        c.    BUSTAMANTE said, "But we get situations like with Lalo, or with another friend of mine that has [narcotics] plantations here, and like, 'I just need deposits and send to Mexico, or somewhere where I need to send it, but they're giving me a hard time to even put the money into the bank system.' They're not scared to pay a fee, it's just more [of a question whether] . . . we have the access to process it. You know?" BARTON said, "There are a lot of people with this problem. I would say, will they fund some money for [u/i] in how to solve their problem?"

37.    Based on my training and experience, and knowledge of the investigation, I believe that in this call, BUSTAMANTE and BARTON were discussing (a) the establishment of an account to launder narcotics proceeds through the banking system; (b) the importance of coming up with a substantial sum of proceeds to launder, in order to incentivize bankers to take the risk of dealing in the proceeds; (c) fabricating a false story regarding the origin of the funds, such that they are not identified as narcotics proceeds; and (d) Lalo and other of BUSTAMANTE's acquaintances use the BUSTAMANTE MLO to launder narcotics proceeds located in the United States and transfer them to destinations in Mexico and elsewhere.

### F.    BUSTAMANTE, OWEN, and BARTON Use BARTON-Controlled Bank Accounts to Launder Narcotics Proceeds for Lalo, Individual A, and Other Narcotics Traffickers.

38.    As discussed below, between 2017 and 2019, BUSTAMANTE, OWEN, and BARTON used at least five different bank accounts controlled by BARTON to launder approximately $836,019 in illicit proceeds on behalf of narcotics traffickers,

including Lalo, and others. The BUSTAMANTE MLO used these bank accounts to accept deposits of narcotics proceeds and shortly thereafter transfer them to other accounts. During several intercepted calls, BUSTAMANTE, OWEN, and BARTON discussed the true nature of these proceeds and the need to fabricate fictitious and putatively legitimate sources for the money, in order to avoid detection by bank management, bank regulators, and law enforcement.

**1.  BUSTAMANTE, OWEN, and BARTON Use BARTON's Chase Bank Accounts to Launder at least $450,361 between 2017 and 2018.**

39.  According to bank records, BARTON opened an IOLTA account, ending in 6709, in the name of Barton Law Firm, LPA ("Chase IOLTA Account 1"). Between April 7, 2017, and May 4, 2018, Chase IOLTA Account 1 received 11 wire transfers totaling approximately $515,161. BARTON initiated corresponding transfers out of the account such that nearly all the transfers in left Chase IOLTA Account 1 within 7 days. In this same time period, there were 16 outgoing wire transfers totaling approximately $500,951. BARTON transferred a total of approximately $13,519 of the $515,161 into another IOLTA account held in the name of Barton Law Firm, LPA. This totals approximately 2.6% of the total incoming wires.

40.  According to bank records, on or about March 9, 2018, Chase IOLTA Account 1 received an incoming wire transfer from Company A Bank Account 1 in the amount of $6,050. According to CS2, BUSTAMANTE had directed CS2 to transfer the $6,000 to Chase IOLTA Account 1. On March 12, 2018, BARTON initiated a wire transfer out to Recipient A in the amount of $6,000. On March 13, 2018, BARTON transferred $50 to another bank account held by Barton Law Firm. The description

on the wire was "[Individual A] Legal Fee." On March 14, 2018, the wire to Recipient A was reversed by the bank. BARTON initiated another $6,000 transfer to Recipient A at a bank in Israel on March 22, 2018.

41. Based on my training and experience, and knowledge of the investigation, including information provided by CS2, UC3's conversations with BUSTAMANTE, the subsequent deposit of $94,000 into the UC Bank Account (discussed below), intercepted communications, and seized emails from BUSTAMANTE's email account, I believe that: (a) Chase IOLTA Account 1 was used by the BUSTAMANTE MLO in the same manner as Company A Bank Account 1 and the UC Bank Account, to conceal the true origins and/or owners of narcotics proceeds; (b) BUSTAMANTE and his associates deposited narcotics proceeds into Chase IOLTA Account 1, then instructed BARTON to transfer a majority of those funds to other destinations, allowing BARTON to keep approximately 2.5% of the transactions as payment for his services; (c) in the March 2018 transaction described above, BUSTAMANTE had deposited narcotics proceeds belonging to Individual A into Company A Bank Account 1; (d) BUSTAMANTE then directed CS2 to transfer a portion of those proceeds ($6,050) to Chase IOLTA Account 1, controlled by BARTON, to further conceal the true owner and origin of the funds; and (e) subsequently, either BUSTAMANTE or Individual A instructed BARTON to transfer $6,000 to Recipient A, allowing BARTON to keep $50 from the transaction as a commission, which he falsely described as a "legal fee" to give the appearance that the transaction was legitimate.

37

42. According to bank records, on or about May 16, 2018, BARTON opened another IOLTA account at Chase, number ending in 8870, in the name of Barton Law Firm, LPA ("Chase IOLTA Account 2").

43. On or about May 17, 2018, two wire transfers, in the amounts of $140,000 and $91,720, entered Chase IOLTA Account 2. The following day, on May 18, 2018, BARTON initiated two wire transfers, in the amounts of approximately $50,000 and $37,860, to Individual G. On both these wires, BARTON included the description, "From [Individual A] Loan Repayment." Also on May 18, 2018, BARTON sent a wire transfer in the amount of $3,000 to another bank account held in the name of Barton Law Firm LPA, with the description "[Individual A] Legal Fee."

44. Based on my training and experience, and knowledge of the investigation, including information provided by CS2, UC3's conversations with BUSTAMANTE, the subsequent deposit of $94,000 into the UC Bank Account (discussed below), intercepted communications, and seized emails from BUSTAMANTE's email account, I believe that this was another instance in which BUSTAMANTE's associates, including Individual A, deposited narcotics proceeds into Chase IOLTA Account 2, then instructed BARTON to wire those proceeds to various destinations as instructed, in an attempt to disguise and conceal the true source, origin, and owner of the funds.

### 2. BUSTAMANTE, OWEN, and BARTON Use BARTON's Huntington IOLTA Account to Launder Narcotics Proceeds between 2018 and 2019.

45. According to records obtained from Huntington National Bank, the Huntington IOLTA Account was opened by Barton Law Firm LPA on or about August 13, 2013. BARTON has sole signature authority for this account.

46. Account records show that the account had no activity between September 2014 and May 2016, when one check for $40 was deposited into the account. The next account activity occurred in June 2018, when a cashier's check for $150,000 was deposited into the Huntington IOLTA Account, drawn from BARTON's account at another bank.

47. From June 2018 to April 2019, the Huntington IOLTA Account received incoming wire transfers and cashier's checks totaling approximately $491,074. During the same time period, there were outgoing wires totaling approximately $452,967.

48. On or about April 3, 2019, at approximately 7:30 p.m. (TP7 Session 490), BUSTAMANTE, who was using Target Phone 7, had a call with OWEN, who was using Target Phone 8.[20] During this call:

---

[20] Agents identified OWEN as the user of Target Phone 8 as follows: according to phone records, Target Phone 8 is subscribed to a woman who shares the same last name as OWEN. OWEN has also identified himself as the user of Target Phone 8 during intercepted communications. For example, on April 4, 2019, at approximately 3:18 p.m., in an intercepted communication (TP7 Session 648), BUSTAMANTE, using Target Phone 7, placed an outgoing call to Target Phone 8. The user of Target Phone 8 answered the phone by stating, "Hi, this is Rick Owen." Additionally, CS2 stated that CS2 communicated with OWEN at Target Phone 8.

a.　OWEN stated, "Let me talk to Jery [BARTON] and let me tell him we got another 40 [$40,000 in narcotics proceeds] going in [the Huntington IOLTA Account]." OWEN then asked, "You putting 50 and 40, right [you are making two deposits of $50,000 and $40,000 into the account, right]?" BUSTAMANTE replied, "50, 40 and then 210 on Monday [deposits of $50,000 and $40,000, and a deposit of $210,000 on Monday]."

b.　Later in the conversation, OWEN asked, "And so Lalo [Mexico-based drug trafficker] just wants to be introduced to Jery [BARTON]?" BUSTAMANTE replied, "Yeah just to . . . so he can know he has the communication with Jery." OWEN stated, "Okay, alright. Now what's our stories about the origins [the falsified cover story regarding the source of the narcotics proceeds]?" BUSTAMANTE responded, "It's cannabis, but you know . . . ." OWEN interjected "You can't say cannabis [they must conceal the true source of the cash deposits]." BUSTAMANTE said "I don't know, make something up and I'll follow along." OWEN suggested, "Farm equipment." BUSTAMANTE replied "Sure."

49.　Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications; consensually recorded calls between BUSTAMANTE and CS2; information from the UCs, CS1, and CS2; and the prior seizure of kilogram quantities of heroin from HERNANDEZ – I believe that, during this call over the Target Phones, BUSTAMANTE and OWEN (a) discussed their plans to launder approximately $340,000 in narcotics proceeds belonging to a Mexico-based drug trafficker named "Lalo" through the Huntington

40

IOLTA Account controlled by BARTON; (b) acknowledged that the true source of these proceeds was from the unlawful sale of marijuana; and (c) discussed the need to create an alternative and false source of the proceeds, such as "farm equipment" sales, to launder the money through the designated account.

50.     According to bank records for BARTON's Huntington IOLTA Account, on April 4, 2019, Individual F conducted a cash deposit of $34,400 into the Huntington IOLTA Account. The following day, BUSTAMANTE conducted a cash deposit of $45,000 into the Huntington IOLTA Account. On April 8, 2019, BARTON transferred $25,000 to the Company B Bank Account. On April 9, 2019, BARTON transferred $22,000 to the Company B Bank Account.[21]

51.     On or about April 9, 2019, at approximately 8:41 a.m. (TP7 Session 1257), BUSTAMANTE, using Target Phone 7, had a phone conversation with BARTON, using Barton Phone 1.[22] During that conversation, BUSTAMANTE said, "Remember yesterday you sent over 25,000 to a Chase account... We need to finish off that client with 22 [$22,000] today." BARTON asked, "Said another 22 to the same place, is that what you are saying?" BUSTAMANTE confirmed, "Yes, sir." Later in

---

[21] As described in paragraph 126, the Company B Bank Account is the same destination to which BUSTAMANTE later instructed UC3 to wire narcotics proceeds on April 17, 2019.

[22] Agents identified BARTON as the user of Barton Phone 1 as follows: CS2 identified BARTON as the user of Barton Phone 1. Additionally, Barton Phone 1 is subscribed to Barton Law Firm LPA, 7445 Airport Hwy, Holland, OH 43528. Additionally, in email communications sent to BUSTAMANTE from email address "jery@bartonlawfirmlpa.com" the signature block is: "Barton Law Firm LPA. Cell: [Barton Phone 1]." On or about May 22, 2019, agents interviewed BARTON and became familiar with his voice.   Agents who participated in that interview have reviewed recorded intercepted calls capturing the voice of the user of Barton Phone 1, and based on that review, recognized BARTON as the user of Barton Phone 1.

the conversation, BUSTAMANTE said, "[W]e had a dealer [narcotics trafficker, referring to Individual F] deposit [$]34,400 remember." During the conversation, BARTON also asked, "Who is [Company B] exactly by the way?" BUSTAMANTE answered, "[Company B] is...A uh...a company that buys bitcoins, but also all the servers and all technology stuff."

52. Based on my training and experience and knowledge of the investigation, including prior and subsequent intercepted communications, and bank records, I believe that in the above conversation, (i) BUSTAMANTE confirmed that BARTON had transferred, to the Company B Bank Account, $25,000 of the narcotics proceeds that BUSTAMANTE and Individual F had previously deposited into the Huntington IOLTA Account; (ii) BARTON transferred those $25,000 from the Huntington IOLTA Account to the Company B Bank Account a day before he even knew what Company B was, showing that these deposits and subsequent transfers to the Company B Bank Account were not legitimate transactions associated with BARTON's law practice and were instead transactions designed to launder narcotics proceeds; (iii) BUSTAMANTE instructed BARTON to transfer another $22,000 of those narcotics proceeds from the Huntington IOLTA Account to the Company B Bank Account; (iv) BUSTAMANTE acknowledged that Individual F was a narcotics trafficker ("dealer"); and (v) as instructed, on April 9, 2019, BARTON transferred $22,000 from the Huntington IOLTA Account to the Company B Bank Account—the day after BUSTAMANTE made clear to BARTON that these were narcotics proceeds.

42

53.     On or about April 12, 2019, at approximately 3:08 p.m. (TP7 Session 2051), OWEN, using Target Phone 8, placed a phone call to BUSTAMANTE, using Target Phone 7. During this conversation:

a.     OWEN stated, "[T]hey need to open up a Bank of America account so the money can go right in to it, unless they have one [the MLO needs a Bank of America account because Bank of America makes deposits available for withdrawal immediately]." BUSTAMANTE responded, "Give 'em Jery's [BARTON's bank account information]." OWEN stated, "Jery [BARTON] doesn't have a Bank of America [account]." BUSTAMANTE responded, "I know, or I can make my [U/I] but we have to keep the cover of everything [conceal the true source of the narcotics proceeds that move through MLO bank accounts, which BARTON's existing account does]."

b.     OWEN stated, "Okay, alright. . . .[J]ust tell them [Lalo and associates] that you're gonna' have them [BARTON] wire the money to the account [bank account designated by Lalo]. Let me tell Jery [BARTON] that right now." BUSTAMANTE responded, "Yeah, 'cause Jery will serve as our paymaster [BARTON will send the wire transfers to the bank accounts provided by Lalo and associates]."

54.     Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications; consensually recorded calls between BUSTAMANTE and CS2; information from the UCs, CS1, and CS2; and the prior seizure of kilogram quantities of heroin from HERNANDEZ – I believe that, during this call over the Target Phones, (a) OWEN asked BUSTAMANTE to

43

arrange for the MLO to open an account with Bank of America so that the DTO and MLO members could withdraw money from that account immediately after it is deposited; (b) BUSTAMANTE advised that the narcotics proceeds had to be laundered through the preexisting Huntington IOLTA Account controlled by BARTON because that account already provided the cover needed to conceal the true source and nature of the narcotics proceeds; and (c) BUSTAMANTE and OWEN agreed to have Lalo and his associates wire the money to BARTON's account, purport that the narcotics proceeds related to the "construction" industry, and provide accounts to which BARTON would later wire the money after it was received and thereby laundered.

55. On or about April 20, 2019, at approximately 1:21 p.m. (TP7 Session 3546), BUSTAMANTE, using Target Phone 7, had a phone conversation with OWEN, using Target Phone 8. During the conversation:

a. OWEN said, "I gotta have [give] Jery something [a false explanation for narcotics proceeds deposited into BARTON's Huntington Compliance Paymaster account] for the senior banker, so I can send it over to him, so he can review it over the weekend. I gotta write out, and what I'm gonna write a narrative, that all the stuff we're putting in, through Huntington is gonna be around this. So you'll have the story right, so listen closely and make sure we don't have any dumbasses saying anything. So we got 10,000 acres for acting operation, that's going on. And in that selecting operation, we have investors that help us with payroll, some of that is delivered in cash, some of it it's delivered to

44

buy equipment. Because each one of these... uh, 4,000 wells that are gonna be created and every frack has to have people in payroll, so we're taking in individual small dollar investors to be able to made up payroll, because we can't put everything in... to... we can't get all the stuff borrowed that we need to. So in each family unit that owns part of the lease, we will take funds from them, collect them and then put them in that will go to different people that have lended us the payroll money, okay?"

      b.    BUSTAMANTE agreed, "Okay." OWEN said, "So I'm gonna create that. And Lalo [Mexico-based drug trafficker] is calling every 5 minutes, but I gotta fix this, because we're probably going to in and out his money, and I need to make sure that this is gonna be open for other transactions."

      56.    Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded calls and meetings between BUSTAMANTE, CS2, and the UCs; information from CS1 and CS2; the prior seizure of wholesale quantities of narcotics from HERNANDEZ and multiple couriers who delivered cash to BUSTAMANTE; and bank records for BARTON's Huntington bank – I believe that OWEN, in this call, told BUSTAMANTE that he was creating a "story" to tell the bankers at Huntington Bank, as a false explanation for the origin of narcotics proceeds that BUSTAMANTE, OWEN, and BARTON were moving through BARTON's Huntington account on behalf of Lalo.

      57.    On or about April 22, 2019, at approximately 10:35 a.m. (TP7 Session 3712), BUSTAMANTE, using Target Phone 7, spoke to BARTON, using Barton

Phone 1, to discuss deposits BUSTAMANTE had made into BARTON's Huntington IOLTA Account as well as red flags their deposits were creating within the bank. During the conversation:

a. BARTON stated he had a conversation with a manager at Huntington Bank who had some compliance issues with one of BARTON's accounts. BARTON stated "The two items [compliance issues] are the [$]89,000 [drug proceeds] deposit that you made in Pittsburgh, . . . I think we can wordsmith something that would be appropriate there [create a believable false explanation regarding the origin of the $89,000 in narcotics proceeds that BUSTAMANTE had deposited into BARTON's Huntington Bank Account at a location in Pittsburgh]. And I asked Rick [OWEN] to give a summary what this overall thing is about so I can take that outline and turn it to a memo and turn it to [the bank manager], . . . and I'm going to need the same from you, or I'm to need you to help me edit what I write up, so you can be thinking about that."

b. BARTON explained that he also received an inquiry about a transaction that occurred in June 2018. He explained, "The second thing is a bit more problematic in my mind, which, [relates to a] wire I sent, June of . . . 2018, in the amount of... ah, I forget the amount, to the guy named.... Um, [Individual G]." BARTON added "I sent a wire to this guy named [Individual G]...you remember this, um, to a bank account in Luxembourg and it came back... um, and the Deutsche Bank reply when they send it [Bank transfer of narcotics proceeds] back was that 'no such account,' but then it also said, 'suspicious transaction'." BARTON continued, "So, I

46

need to....um, explain what this was about [have a legal explanation regarding the funds], concisely and credibly using the best knowledge that we have. What was I told by [Individual A] that [Individual G, a straw owner] had loaned money to a Mexican [corporation] and that these were loan repayments amounts. Supposedly he had made 5 million dollar loan. Huntington [Bank] wants to know background, what was the loan, and to whom, and so forth... So, now... this was not presented to me [by the manager at Huntington Bank] in an alarming sort of way [indicating the manager was concerned about the legality of the funds], ok.... it was presented to me in a routine sort of way."

      c.    BUSTAMANTE replied "Ok" and after BARTON stated he did not want to speak with Individual A, BUSTAMANTE stated "Ah, No, I can write you a narrative [explanation of the history of funds]. And I think it was basically a loan to kind of help out a company. [Individual A] is still in [unintelligible] and the bonds stuff [unintelligible] [Individual A] is the owner and operator for, it's called "CASA VOGUE" [straw business for money laundering], which is...." BARTON responded "Can you put this in an email to me or a text?" and BUSTAMANTE stated "Yeah, yeah..."

      d.    BARTON later stated "Well, there is a lot of this. And you know, our goal, our mutual goal is to put this to bed as cleanly and concisely [explain the history of funds in an effort to lead the bank manager to believe the funds were obtained and deposited legally] as possible and I am prepared to apologize and say 'I wouldn't do this transaction again,' you know what I mean. They don't have any

complaint sort to speak, about the money that went to Miami [other drug proceeds which were laundered to an account used by the DTO successfully]...So, they are only interested in this one, apparently, now, it is not necessary through compliance that will tell you about their concerns, but help me out to the best of your ability and I'll get something drafted."

     e.   BARTON said, "When we get a response that is satisfactory regarding the Pittsburgh deposit [bulk currency pickup and deposit BUSTAMANTE conducted], we'll have a green light for more cash deposits [of narcotics proceeds]. As for now, we shouldn't make any more [bulk currency and subsequent laundering of drug proceeds] until this is done [to avoid drawing further attention from bank compliance officers and law enforcement]."

58.     On or about May 10, 2019, the Huntington IOLTA Account received a wire transfer of approximately $35,000 from Company C. On May 10, 2019, at approximately 10:36 a.m. (TP8 Session 392), BARTON, using Barton Phone 1, had a phone call with OWEN, using Target Phone 8, to acknowledge the deposit. BARTON said, "In just seconds ago I had [$]35,000 pop into the IOLTA." OWEN said, "Good. He [BUSTAMANTE] said it's gonna be 45 and...50. So I guess he's sending it in different chunks." BARTON said, "I can either disburse or I can move it into one of my other accounts. Nothing is going to happen to it. But I wanted to know it's there."

59.     On May 20, 2019, at approximately 12:48 p.m. (TP7 Session 7018) BUSTAMANTE, using Target Phone 7, spoke with BARTON, using Barton Phone 1,

to discuss how to explain to Huntington bankers Individual F's cash deposit activity into BARTON's account. During this call:

a.     BARTON said, "Okay, next, on this deal with [Individual F] and Lalo [Mexico-based source of narcotics supply], obviously I wanna do it, Erick. It's very timely to kick start some cash flow but I don't wanna do anything that gets us in any form of trouble. So I have a couple questions. Number 1, if Huntington [Bank] would decide to run a background check on Fernando [Individual F], would they find anything bad?" BUSTAMANTE responded, "Not to my knowledge."

b.     BARTON stated, "Okay, what is his relationship with Lalo?" BUSTAMANTE responded, "He is just one of his runners [an individual who collects narcotics proceeds and/or delivers narcotics]." BARTON responded, "One of his runners is, you know, that's not what Huntington [Bank] wants to hear. Is he a business associate in some recognizable...?" BUSTAMANTE responded, "He's an employee."

60.     Based on my training and experience, and knowledge of the investigation, including intercepted communications and bank account activity, I believe that in the above communication, (a) BARTON was telling BUSTAMANTE that he wanted to avoid raising the suspicion of Huntington Bank (which held BARTON's now closed IOLTA Account and the currently active Compliance Paymaster account), which could lead to the bank reporting them to law enforcement, based on the cash deposits into his accounts by Individual F; (b) BARTON did not want to tell Huntington Bank that Individual F, who was making cash deposits into

49

BARTON's accounts, was a "runner" for Lalo, because BARTON knew that term too closely implied an association with narcotics traffickers; (c) BARTON asked BUSTAMANTE how they could describe Individual F's position in a way that would not raise suspicion; and (d) BUSTAMANTE advised BARTON to describe Individual F as an "employee."

61.    On May 22, 2019 at approximately 9:05 a.m., IRS-CI Special Agents interviewed BARTON at BARTON's office in Holland, Ohio. During this interview, BARTON stated that he is a retired attorney and that his law firm is closed. Agents advised BARTON that they were aware of a $34,400 cash transaction into BARTON's Huntington Bank account, which was deposited by Individual F. When asked if he knew Individual F, BARTON said that he was familiar with Individual F, that Individual F was connected to a client, and that BARTON couldn't discuss the matter further other than to say it was a fully lawful transaction.

62.    On May 22, 2019, at approximately 10:10 a.m. (TP7 Session 7130) BUSTAMANTE, using Target Phone 7, spoke with BARTON, using Barton Phone 1. During the conversation:

a.    BARTON stated, "Now, we have another event that I'm not too happy about and you won't be either. First thing this morning in the office, two men showed up from the criminal investigation unit of the IRS." BARTON continued, "And they were asking questions about things that are not a problem at all. . . . And then, as they were wrapping up, they said, 'What do you know about Fernando [Individual F]?' And I said, 'I know who he is, and that's a client matter. And I'm not able to share

any information.' And they said, 'Okay, fine.' And folded up their notebooks and left. So... but they have the detail of the 34,000 dollars deposit, they had everything right there in front of them. So now, this is the IRS. It's not, you know, it's not some other agency. So I'm starting to feel... well, I feel like you would feel about it. Why are they looking into Fernando two weeks after it happened? You know, with a fresh file, they obviously got it off a form that Huntington has to file when there's cash deposits over 10,000."

      b.    BARTON continued, "So I told him nothing. I did not give them your name, Lalo's [Mexico-based source of supply] name, anybody's name, but I am concerned. And by the way I called the Pelican Bay branch at Huntington and said that we would not be requesting them to accept the cash deposit per yesterday's discussion." BARTON later stated, "I want you to give some thought, to what this could be about with Fernando [Individual F]. I have the guy's [IRS agent's] name and number. He came from Chicago. And that's another thing, that's a little odd, you know? Because if it were routine, they could have just called me up. I mean, they know who I am, where I am. They walk in right into my office, lobby there, so... I don't know any more about it. But that's that. The good news is, it's 34,000 it's not 3.4 million."

63.    Based on my training and experience and knowledge of the investigation, including prior intercepted communications, bank records, and the interview with BARTON, I believe that in the above conversation, BARTON (a) told BUSTAMANTE about the unexpected interview with IRS special agents; (b) assured

BUSTAMANTE that BARTON did not reveal to the agents that BUSTAMANTE or Lalo were involved in the deposit made by Individual F, (c) told BUSTAMANTE that BARTON was concerned about the attention from federal law enforcement, and (d) canceled a pre-planned cash deposit into one of BARTON's accounts that was to occur at a Huntington Bank branch in Florida, because BARTON did not want to attract further attention of law enforcement.

64. According to Huntington Bank records, on May 28, 2019 – less than one week after IRS agents questioned him regarding transactions on the account – BARTON closed the Huntington IOLTA Account. Based on my training and experience, and knowledge of the investigation, including intercepted communications, and BARTON's resignation of his bar license, I believe that following his April 2019 resignation, BARTON had to wind down the use of his Huntington IOLTA account, because an IOLTA account is intended for the use of practicing attorneys, and that BARTON opened a new account—the Huntington Paymaster Account described below—to continue money-laundering transactions without raising the suspicion of law enforcement or banking authorities.

65. On June 10, 2019, at approximately 2:59 p.m. (TP7 Session 7970) BUSTAMANTE, using Target Phone 7, spoke with Jery BARTON, Barton Phone 1. During the conversation:

a. BUSTAMANTE stated, "Yes, I was gonna send you a document. You know the guy [Individual F]?" BARTON responded, "Yeah." BUSTAMANTE stated, "So he [Individual F] was in Boston and apparently homeland security [U.S.

52

Department of Homeland Security] ended up seizing 72,000 dollars. The thing is when he- the story of the narrative is basically, on April 7th or so, he went to Boston, went to a pick up [of cash narcotics proceeds], as soon as he left the parking lot after receiving the package [narcotics proceeds], he pulled out of the parking lot of the supermarket area, pulled into the main street, automatically 5 patrol cars surround him and basically stop him as a traffic but end up calling a K-9 unit which finds a package with alleged money [narcotics proceeds] in the back. So that happens, doesn't get arrested he just hands to hand the money over to the agents, okay? Once that happens, they don't book him they don't give him any paperwork, they don't give him anything. They let him go, he comes back, talks to Lalo [Mexico-based narcotics source of supply] and says, 'Hey, this happened.' So we are thinking this is a bunch of cops, you know, because– well, it doesn't make any sense if he didn't even get a business card from any of the agents. So now he received a letter. I wanna see if you give me permission, I can forward it to you so you can read and if you can explain the language to us. It's giving him to options of how to claim the money back but there is no charges that are displayed on the documentation. So he is not being charged with anything, it's just that for whatever reason he was stopped, he was seized 72,000 dollars."

      b.     BARTON responded, "Yeah. I really can't help him Eric." BARTON stated, "And the reason for that and I don't know if you told him this or not. I think it probably preferable if you do not but I had a criminal investigator from the

IRS here in my office wanting to know about [Individual F] and I told you immediately when it happened." BUSTAMANTE stated, "Right, right."

      c.    BARTON stated, "And they [IRS] would not tell me why they were inquiring. They said that they are not able to share any details about an investigation. It was very strange. You remember I called and I asked you who he was and– but I assumed but I don't know for a fact that when Hunting [Huntington Bank] accepted that deposit of 34,000 dollars, they file a form with the Fed showing a cash deposit in that amount, and somehow that form got flipped to the IRS. But this guy [IRS Agent] that showed up at my office was from Chicago. So I'm not saying he came here strictly for that purpose, okay? I don't know that, but I don't know Fernando and I think he needs to get a lawyer in Boston if that's where the money is."

    66.    Based on my training and experience, and knowledge of the investigation, including prior intercepted communications and the IRS interview of BARTON, I believe that in the above conversation, (i) BUSTAMANTE told BARTON that Individual F had been stopped by law enforcement while picking up $72,000 cash narcotics proceeds for Lalo; (ii) BUSTAMANTE explained that law enforcement seized the $72,000 of narcotics proceeds after a K9 unit alerted to the presence of narcotics, which led to the discovery of the narcotics proceeds; and (iii) BARTON suspected that IRS and possibly other agencies are investigating Individual F's activities and BARTON did not want to associate further with Individual F, which would raise suspicion.

### 3. BUSTAMANTE, OWEN, and BARTON Use Another BARTON-Controlled Compliance Paymaster Account at Huntington to Launder Money in 2019.

67. According to records from Huntington National Bank, a checking account number *******9283, held in the name of Compliance Paymaster LLC ("Huntington Paymaster Account"), was opened on or about March 19, 2019. According to the South Dakota Secretary of State, BARTON established a business in the same name as the Huntington Paymaster Account, Compliance Paymaster LLC, on January 4, 2019. The Articles of Organization for Compliance Paymaster LLC list its address as 7445 Airport Highway, Suite 1A, Holland, Ohio, which is the same address as BARTON's former law firm practice.

68. According to records obtained from Huntington Bank, between March 19, 2019 and May 31, 2019, the Huntington Paymaster Account received a total six credits.[23] Of those six credits, one was a large wire transfer and one was a large cash deposit, both of which were transferred out of the Huntington Paymaster Account to other accounts within a week, consistent with the pattern of activity described above in the Company A and Company B Bank Accounts.[24]

69. On April 16, 2019, the Huntington Paymaster Account received an incoming wire transfer in the amount of $50,000 from an account in the name of "[Individual H]." The next day, on April 17, 2019, BARTON transferred $8,500 to his

---

[23] Excluding four Marathon Gas rebate payments under $1.

[24] The other four credits were: two internet transfers from other bank accounts controlled by BARTON in the amount of $50 and $13,296.68, respectively, and two cash deposits in the amount of $100 and $62,115, respectively.

personal account ending in 8322. Six days later, on April 22, 2019, BARTON transferred $40,000 an international account held in the name of Individual I.

70.    On May 2, 2019, BUSTAMANTE deposited $62,115 of currency into the Huntington Paymaster Account. The following day, on May 3, 2019, BARTON wire transferred nearly all of that money – $61,291.90 – to the Company B Bank Account.

71.    The Huntington Paymaster Account did not receive any other regular or repeated deposits or funds that would be consistent with employment or business income. Based on my training and experience, my knowledge of the investigation, including the information provided by CS2 about the BUSTAMANTE's use of Company A Bank Account 1, and BUSTAMANTE's use of the UC Bank Account to receive cash deposits and transfer funds to the same Company B Bank Account, I believe that the aforementioned funds moved through the Huntington Paymaster Account – a total of approximately $112,115 – were narcotics proceeds and that the purpose of these transactions was to conceal the source of the funds.

72.    During the same period of time, with the exception of the transfers described above, the money moving out of the Huntington Paymaster Account was spent on miscellaneous personal items and fees, summarized below:

| Description | Amount |
|---|---|
| Basil Pizza & Wine Bar | $ 88.93 |
| Best Buy | $ 53.61 |
| Fire Pit Grille | $ 23.80 |
| Harland Clarke Chk Order | $ 26.80 |
| Holloway Beverages | $ 19.28 |
| Kroger | $ 91.92 |
| Marathon Petro | $ 100.50 |
| Mnrd | $ 8.53 |
| Smokey Bones | $ 32.04 |

| | | |
|---|---|---:|
| Starbucks | $ | 35.00 |
| Statement Charge | $ | 3.00 |
| Wire Transfer Fees | $ | 108.00 |
| WM Supercenter | $ | 11.15 |
| Heb Design | $ | 100.00 |
| DCU | $ | 1,000.00 |
| International Pursuits | $ | 550.00[25] |
| **Total** | **$** | **2,252.56** |

73. Based on my training and experience, and my knowledge of the investigation, including the information provided by CS2 about the BUSTAMANTE MLO's use of Company A Bank Account 1 and the bank records described above, I believe that BUSTAMANTE and BARTON have used the Huntington Paymaster Account similarly to Company A Bank Account 1, wherein BUSTAMANTE deposited, or coordinated the transfer of, large amounts of narcotics proceeds into the Huntington Paymaster Account and directed BARTON to transfer the funds out of the Huntington Paymaster Account shortly thereafter, allowing BARTON to keep and use for personal expenses a small percentage of the funds, as a fee for use of the Huntington Paymaster Account.

### G. BUSTAMANTE and OWEN Launder Approximately $416,920 in Narcotics Proceeds, which BUSTAMANTE Collected from Various Parts of the United States, through Two Chicago-Based Companies

74. As discussed below, between on or about April 15, 2019, and May 16, 2019, BUSTAMANTE and OWEN laundered approximately $416,920 in narcotics proceeds through two Chicago-based companies. BUSTAMANTE collected those

---

[25] A memo on this debit read "May '19 Rent".

proceeds from various money couriers and drug traffickers in Kentucky, Ohio, Illinois, and Alabama, and attempted to collect approximately $101,000 from another narcotics trafficker in Tennessee. On behalf of himself and the other members of his MLO (including OWEN), BUSTAMANTE deposited (i) approximately $311,980 of those proceeds at a wire transfer business in Chicago ("Wire Transfer Business A") in four installments on April 16, 2019, May 2, 2019, May 7, 2019, and May 17, 2019; and (ii) on April 17, 2019, approximately $94,000 into a bank account controlled by an undercover agent (UC3) posing as a Chicago-based businessman willing to allow the MLO to launder funds through his corporate bank account.

### 1. BUSTAMANTE and OWEN Recruit an Undercover DEA Agent Posing as a Chicago-Area Businessman to Provide a Bank Account to Launder Money

75. In February 2019, CS2 telephonically introduced BUSTAMANTE to another undercover DEA agent ("UC3"), describing UC3 as the employee of an air transportation company where UC1 and UC2 worked, who could provide BUSTAMANTE with air transportation. During the recorded telephone conversations between BUSTAMANTE and UC3, UC3 advised BUSTAMANTE that UC3's company was located in West Chicago. BUSTAMANTE indicated that he would like to meet UC3 during BUSTAMANTE's planned future trip to Chicago. Also during the calls, BUSTAMANTE discussed the use of UC3's purported private aircraft services for international and domestic travel. BUSTAMANTE specifically inquired about UC3's ability to travel to and from Ecuador, Colombia, Mexico, Dominican Republic, and Guatemala. During this conversation, BUSTAMANTE also asked UC3

58

if BUSTAMANTE could use the bank account of UC3's purported employer ("UC Bank Account") to deposit bulk currency.

76.     On or about April 10, 2019, at approximately 4:46 p.m. (TP7 Session 1688), BUSTAMANTE, using Target Phone 7, called UC3 to discuss the agreement to use the UC Bank Account to accept bulk cash deposits. During the conversation:

a.      UC3 advised, "I talked to my boss and if it's alright with you, we're gonna go ahead with what you considered reasonable. We're gonna go with 2.5% like we talked about [UC3's company would take 2.5% of each deposit as a commission for allowing use of the bank account] . . . ." BUSTAMANTE asked, "How much can I do [deposit] daily?" UC3 answered that to avoid "red flags," he wanted to "start off a little bit slow," "maybe 50 [$50,000] to 100 [$100,000] a week." UC3 asked, "[D]oes that work?" BUSTAMANTE replied, "Yeah it sure can."

b.      BUSTAMANTE asked how long it would take for UC3 to transfer the funds out of the account after the deposit. UC3 responded, "I think like 2-3 days would be a reasonable amount of time if not sooner. . . . [A]re they gonna be primarily domestic wires [will the transferee accounts be in the United States]?" BUSTAMANTE replied, "Yeah, we'll just have you shoot it over to my attorney [BARTON] and then I'll do all my distribution [further transfers of the proceeds] from there [BARTON's accounts]."[26]

---

[26] According to the Supreme Court of Ohio website, BARTON was previously admitted in the State of Ohio to practice law, but resigned his license on or about April 4, 2019. A search of the attorney licensing authorities of other states indicated no evidence that BARTON is or was licensed in any other state.

77. Based on my training, experience, and familiarity with this case, including information from CS2, Company A Bank Account 1 records, and BUSTAMANTE's subsequent of $94,000 into the UC Bank Account on April 17, 2019, I believe that in the above conversation, BUSTAMANTE confirmed, consistent with his prior discussions with UC3, BUSTAMANTE and his associates would (a) deposit up to $100,000 of narcotics proceeds weekly into the UC Bank Account; (b) thereafter instruct UC3 where to transfer those proceeds; and (c) in exchange, pay UC3 2.5% of each deposit as a commission.

78. On April 11, 2019, at approximately 5:06 p.m., OWEN who was using Target Phone 8, spoke with CS2. During the conversation, OWEN asked, "Yeah, so said that [UC3] guy, right? Is that his name?" CS2 responded, "Yeah." OWEN stated, "Okay." CS2 responded, "They'll do it, you just can't go in there with a million dollars [cannot deposit a single large sum in the UC Bank Account]." OWEN stated, "Well, I told him [BUSTAMANTE], if he had a couple hundred thousand [dollars], just put a couple hundred thousand in [deposit approximately $200,000 into the UC Bank Account]."

79. On April 11, 2019, at approximately 5:10 p.m. (TP7 Session 1944). BUSTAMANTE, using Target Phone 7, had a telephone conversation with OWEN, who was using Target Phone 8. During the conversation:

a. OWEN stated, "Second point I want to make is between 50 and 100 [$50,000 and $100,000 in narcotics proceeds] a day and every other day you can

put in [to the UC Bank Account], and then the following week we'll raise it [increase the amount of narcotics proceeds that is deposited into the bank account]."

      b.    BUSTAMANTE responded, "I just talked to [UC3]. For the first couple of weeks 200 K [$200,000] maximum and then we can build up to about 100 [$100,000 narcotics proceeds] a day or you know... and we need to do a million or half a million a day [$1,000,000 or $500,000]...but we need to start building up the account." OWEN stated, "Okay and you got the small ones [narcotics proceeds pick-ups] to do that with right?" BUSTAMANTE responded, "Yeah." OWEN said, "Okay, at least we got that."

      80.    Based on my training and experience, and knowledge of the investigation – including prior and subsequent intercepted communications, and BUSTAMANTE and OWEN's communications with UC3 – I believe that in the previous conversation, (a) BUSTAMANTE told OWEN that initially, they could only deposit up to $200,000 into the UC Bank Account per week, and then they could increase the deposits to $100,000 daily and then possibly up to $500,000 or $1 million daily; (b) BUSTAMANTE said that the MLO needed to start "building the account," meaning that they had to gradually increase the frequency and size of deposits into the UC Bank Account so that they wouldn't attract attention from bank compliance officers or law enforcement by the sudden large-volume account activity they planned; (c) OWEN confirmed with BUSTAMANTE that BUSTAMANTE still had to collect narcotics proceeds in "small" amounts that would fit within the initial $200,000 weekly deposit limits that they discussed.

81.     On April 12, 2019, at approximately 5:14 p.m. (TP7 Session 2105), UC3 received a telephone call from BUSTAMANTE, who was using Target Phone 7. During the call:

a.     BUSTAMANTE introduced "Rick [OWEN]"[27] to UC3 in order to discuss the amount of money that could be deposited into the undercover DEA bank account. OWEN asked UC3, "So I have a quick question, I have to put some cash in your guys' account [UC Bank Account] so you can send it on [send it to another recipient via wire transfer]. Two questions, how much do you charge [commission] and how much can you take [how much money can be funneled through the UC Bank Account]? Uh, and here is my real deal to be honest with you. I need to put in probably about two [$200,000] to 300 [$300,000] to 500 [$500,000] a week, and if different accounts [bank accounts], I don't mind but that's kind of my challenge."

b.     UC3 responded, "'Cause it's a new account, we would go up to about 200 [$200,000]. Probably about 30 to 50 [$30,000 to $50,000] a day into the account just to start maybe a week or two. Make sure that we're not getting any questions asked [drawing the attention of bank regulators or law enforcement], for lack of a better term. And then we can build up from there." OWEN asked, "So 200 [$200,000], I could put multiple deposits the same day, or do I just need to break it up, to what is it evenly over the week, uh like 50 grand [$50,000] a day or something?" UC3 responded, "Yeah, I think [$]50,000 increments would work."

---

[27] Investigating agents compared the voice on the recorded telephone call to intercepted communications and confirmed that the subject that UC3 spoke with was in fact Rick OWEN.

2.   **BUSTAMANTE and OWEN Launder $114,000 of Narcotics Proceeds from a Narcotics Trafficker near Louisville, Kentucky (April 15, 2019)**

a.   **BUSTAMANTE Arranges to Collect Narcotics Proceeds from a Narcotics Trafficker near Louisville, Kentucky**

82.   On or about April 13, 2019, at approximately 10:40 a.m. (TP7 Session 2135), BUSTAMANTE, using Target Phone 7, had a phone call with Individual C, using Individual C Phone 1. During the call, Individual C said, "Good morning. I was told to call you." BUSTAMANTE asked, "Yes, what city?" Individual C responded, "Louisville, Kentucky." BUSTAMANTE advised, "I can be there tomorrow . . . by midday." BUSTAMANTE asked, "[H]ow many units [amount of narcotics proceeds]?" Individual C said, "I think it's around 120 [$120,000], but I'm not sure. Let me check." BUSTAMANTE asked, "Do you know what code they gave you?" Later in the conversation, BUSTAMANTE explained, "[T]hey always provide a serial or a name. I need to know which one it is . . ." Individual C said, "Let me talk thoroughly with this man [an associate of Lalo, a Mexico-based drug trafficker, who arranged for BUSTAMANTE to launder these proceeds] and I'll call you back. But yeah, we're ready for tomorrow."

83.   On or about April 13, 2019, between approximately 10:44 a.m. and 10:47 a.m. (TP7 Sessions 2136, 2140, 2142, 2146, 2148), BUSTAMANTE, using Target Phone 7, exchanged a series of text messages with Individual C, using Individual C Phone 1. During this exchange, BUSTAMANTE wrote, "Check if it's this one," and sent a photograph showing the serial number of a U.S. one dollar bill, which read "J06766674B." Individual C responded, "That's the one." BUSTAMANTE replied,

"Perfect." Individual C wrote, "Louisville, KY by the I-65 South. I'll send you later where we'll have breakfast [the location where BUSTAMANTE would meet to collect the narcotics proceeds]." BUSTAMANTE responded, "Perfect, I'll arrive early to Louisville."

84.     Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded calls and meetings between BUSTAMANTE, CS2, and the UCs; information from CS1 and CS2; the seizure of approximately 15 kilograms of cocaine from Individual C's residence about one month after he met with BUSTAMANTE; and the subsequent seizure of large amounts of currency from the Chicago-based Wire Transfer Business, which BUSTAMANTE visited after meeting with Individual C – I believe that, in these phone calls, (a) BUSTAMANTE arranged to collect approximately $120,000 in narcotics proceeds from Individual C in Louisville, Kentucky; (b) Individual C told BUSTAMANTE that he would send him the address of a restaurant where they could meet to collect the proceeds; and (c) Individual C and BUSTAMANTE exchanged the serial number of a United States one dollar bill because they did not know each other and their respective associates had instructed them to use that serial number as a code to confirm their identities and vouch for their trustworthiness in conducting the illicit transaction.

            **b.     OWEN Helps BUSTAMANTE Arrange Travel to
                     Louisville to Collect Narcotics Proceeds from
                     Individual C**

85.     On April 13, 2019, at approximately 10:58 a.m. (TP7 Session 2160), BUSTAMANTE, using Target Phone 7, spoke with OWEN, who was using Target

Phone 8. During the conversation, BUSTAMANTE asked, "Hey, man, for some reason my Expedia isn't working. Can you find a ticket from Mexico City to Louisville, Kentucky?" OWEN later responded, "Let me find and I'll call. Expedia?" Later during the conversation OWEN confirmed, "Mexico City to Louisville. Okay. All right."

86. On or about April 13, 2019, at approximately 11:01 a.m. (TP7 Session 2163), BUSTAMANTE, using Target Phone 7, spoke with OWEN who was using Target Phone 8. During the conversation:

a. BUSTAMANTE stated, "[L]et's say it [the flight to Louisville] leaves tonight, it would have to be at midnight, so I can get to Louisville, I don't know, six o'clock in the morning maybe." BUSTAMANTE continued, "And if not, then I can get out of here like at 4:30 tomorrow morning, and be there before ten o'clock. That's kind of like the schedule I need, you know? So if you find anything let me know. For some reason my Expedia is not working here [in Mexico]." OWEN responded, "I think I got Expedia that I can talk to right now. So you're looking for... so right now, they're really expensive. There's one at 8:00 p.m., 8:25 p.m. and you'll arrive at 7:00 p.m., the one at 8:25 p.m. that arrives in...from Mexico to there... there's one at 4:00... 3:00... the latest I'm seeing be there... there's a 4:00 p.m. that arrives at 9:00 a.m., but it's expensive."

b. Later during the conversation OWEN stated, "Four p.m. and you'll get there [Louisville] in one day after tonight." BUSTAMANTE responded, "No, no, no. I have to be in Louisville by noon tomorrow, to pick up [the narcotics proceeds from Individual C] at noon." BUSTAMANTE later stated, "And the only reason I'm

65

bugging you, it's 'cause Lalo [Mexico-based source of supply] hasn't picked up his freaking phone. It's his job to grab the tickets [Lalo is supposed to pay for BUSTAMANTE's airfare when collecting narcotics proceeds]. The guy [Individual C] just called me and confirmed me that I needed to pick that [narcotics proceeds] up." OWEN responded, "Okay, I don't see, for today, this can get accomplished."

        c.     OWEN later stated, "So there's a 9:30 p.m. to 6:00 p.m., but that's like 1,000 bucks. Shoot I don't have enough [money] on this card. Should have if I get early or... yeah, I'm not seeing really anything on Expedia that gets you there to be where you need to do [narcotics proceeds pick-up]." BUSTAMANTE responded, "Okay, let me see what I can do. I'll be right back, okay?"

    87.    On or about April 13, 2019, at approximately 4:24 p.m. (TP7 Session 2197), BUSTAMANTE, using Target Phone 7, spoke with Rick OWEN who was using Target Phone 8. During the conversation:

        a.     BUSTAMANTE stated, "Really quick, Lalo is telling me that his contact [DTO associate] that normally buys the tickets [airplane tickets] is not answering him at all but I really need to buy the [airplane] ticket within the next hour because all the prices are gonna get jacked up immediately. Can I send you the screen shot [of the desired flight information] to see if Jery [BARTON] can help us with a [credit] card or something [to purchase the flight for BUSTAMANTE to travel]?" OWEN responded, "Jery [BARTON] can't take it [money] out of his [Huntington IOLTA] account, that's the problem. Jery [BARTON] can't move anything on the weekends. That's what I've been battling with him [BARTON] all

66

day about. So I was trying to get him... he was saying he was gonna send it [money for the airplane ticket] to [Individual D] first thing in the morning. I mean on Monday morning. We were thinking you needed to be there [Louisville, for the narcotics proceeds pickup] Monday not on the weekend. So I told him when you called me back I told him you need to be there on the weekend not on Monday."

b.      BUSTAMANTE stated, "No, it's more tha[n] that, it's the timing. If I buy the ticket on Monday, I won't get there until Monday afternoon, I won't be depositing it [narcotics proceeds into BARTON's account] 'til Tuesday. It won't [U/I] 'til Wednesday, so more than anything it's timing [the money won't be able to be wired to the DTO bank account by Wednesday]. Shit, I don't know what to do. Alright, I'll call you back, thanks man."

88.     On April 13, 2019, at approximately 11:49 p.m. (TP7 Session 2228), BUSTAMANTE, using Target Phone 7, spoke with OWEN, who was using Target Phone 8. During the conversation, BUSTAMANTE stated, "So I'm leaving at 1:30 in the morning, I'll be in the O'Hare Airport by 9:30, by the time I get to Kentucky it'd be probably around 2:15 or so."

89.     According to travel records accessed by U.S. Customs and Border Protection (CBP), BUSTAMANTE traveled from Mexico City to Chicago on Volaris flight Y4934, departing Mexico City at 1:55 a.m. (CDT) and arriving at O'Hare International Airport at 6:16 a.m. (CDT). CBP spoke with BUSTAMANTE during a secondary check while entering customs in Chicago. During this interview, BUSTAMANTE stated that he works for BARTON out of Toledo, Ohio, and that one

67

of his business contacts is OWEN in Silicon Valley, California. BUSTAMANTE also advised that he was scheduled for a connecting flight to Kentucky (American Airlines flight AA3653).

     c.   **BUSTAMANTE Collects Approximately $116,000 in Narcotics Proceeds from Individual C near Louisville**

90.    On April 14, 2019, at approximately 2:31 p.m. (TP7 Session 2323), BUSTAMANTE, using Target Phone 7, had a call with Individual C, who was using Individual C Phone 1. During the conversation, BUSTAMANTE advised Individual C that his flight to Louisville had been canceled due to weather. BUSTAMANTE asked, "[H]ow early are you able to [meet the following day]?" Individual C later stated, "Yeah, like at 6:00 [a.m.] or 6:30 [a.m.] it's a good time. 6:30 [a.m.] is fine so we're not rushing." Individual C stated, "If you want, I'll text it [meeting location] to you, it's by I-65 South exit 117. . . . [T]here's a Denny's Restaurant there. It's open 24 hours."

91.    On or about April 14, 2019, at approximately 2:45 p.m. (TP7 Session 2330), BUSTAMANTE, using Target Phone 7, had a phone call with Marquez, using phone number 52-5614819562. As discussed above, Marquez was the man on the phone during BUSTAMANTE's meeting with the UC pilots, who discussed having the pilots transport 500 kilograms of narcotics. During the call:

     a.   BUSTAMANTE said, "I landed from Mexico here to Chicago . . . . [A]fter 45 minutes of being in the plane they send us all a text saying that the flight had been canceled due to the storm."

b. Marquez asked, "So are you staying tonight there in Chicago or are you going elsewhere?" BUSTAMANTE replied, "At 10:00 at night I'm flying to Louisville, Kentucky. And I'll stay there literally a couple of hours [collect narcotics proceeds from Individual C]. I'll head up to Chicago, make that drop [deposit Individual C's narcotics proceeds at Wire Transfer Business A]. I'll go to Columbus, Ohio [collect narcotics proceeds from Individual E]. I'll make a drop [deposit Individual E's narcotics proceeds in the UC Bank Account], and then I'll return back to Mexico."

92. Minutes later, between approximately 2:46 p.m. and 3:17 p.m. (TP7 Sessions 2333, 2337, 2341, 2343), Individual C, who was using Individual C Phone 1, exchanged a series of text messages with BUSTAMANTE, who was using Target Phone 7. During this exchange, Individual C stated, "Hey, it's best if it's early. We'll meet at 6 am . . . ." Individual C then wrote, "200 S Lakeview Dr Shepherdsville [Kentucky, the locations of the money exchange]." Individual C also stated, "It's going to be 114 units [$114,000 narcotics proceeds]." BUSTAMANTE responded, "Okay, thanks. I'll report it [to the Mexico-based source of supply]."

93. On April 14, 2019, at approximately 10:10 p.m. (TP7 Session 2362), BUSTAMANTE, using Target Phone 7, spoke with OWEN who was using Target Phone 8. During the conversation, BUSTAMANTE stated, "Hey, man, I'm finally getting to the airplane [traveling from Chicago to Louisville], so I'll call you as soon as I land in about 2 hours to let you know I'm..." OWEN responded, "Okay, perfect. And they're [Individual C] going to meet you at 6:00 a.m. [to deliver the narcotics

proceeds]?" Later in the conversation OWEN stated, "Okay, cool. How much [narcotics proceeds] you picking up? Do you know?" BUSTAMANTE responded, "114 [$114,000 in narcotics proceeds]." OWEN stated, "Okay, cool. All right, talk to you soon."

94.     On April 15, 2019, between approximately 4:27 a.m. CST and 5:01 CST (TP7 Session 2375, 2377, 2395, 2397) BUSTAMANTE, using Target Phone 7, exchanged as series of text messages with Individual C, who was using Individual C Phone 1. BUSTAMANTE wrote, "I'm already at the Denny's next to the hotel exiting the freeway." Individual C responded, "Ok, we're on our way. We'll get there in 20 minutes in a gray truck." BUSTAMANTE asked, "114 [$114,000 in narcotics proceeds], right? So I can have the ticket ready." Individual C responded, "Yes".

95.     At approximately 5:06 a.m. CST (6:06 EST, local time), surveillance observed a green pickup truck ("Individual C Vehicle 1") pull into the parking lot of the Denny's restaurant located at 200 South Lakeview Drive in Shepherdsville, Kentucky (the agreed upon meeting location). A short time later, surveillance observed BUSTAMANTE exit the restaurant and enter Individual C Vehicle 1 with a backpack. At approximately 5:09 a.m. CST, surveillance observed BUSTAMANTE exit the truck, carrying a duffel bag that he did not have when he first entered the truck, and walk to a nearby hotel.

96.     Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted calls between BUSTAMANTE and Individual C; surveillance; the seizure of approximately 15 kilograms of cocaine from

70

Individual C's residence about one month after he met with BUSTAMANTE; and the subsequent seizure of large amounts of currency from the Chicago-based Wire Transfer Business, which BUSTAMANTE visited after meeting with Individual C – I believe that BUSTAMANTE (a) met with, and collected approximately $116,000 in narcotics proceeds from, Individual C in the Denny's parking lot in Shepherdsville; (b) after collecting the money, walked it to a nearby hotel where he counted it out; and (c) collected this money from Individual C for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

97.     On April 15, 2019, at approximately 10:06 a.m. CST (TP7 Session 2437), BUSTAMANTE, using Target Phone 7, sent a text message to Individual C, who was using Individual C Phone 1. In this message, BUSTAMANTE stated, "Buddy, we're good 116 [BUSTAMANTE counted out $116,000 in narcotics proceeds delivered by Individual C]. Thanks, and have a nice day."

> **d.     Law     Enforcement     Seizes     Approximately     15 Kilograms of Cocaine from Individual C**

98.     On or about May 8, 2019, less than one month after BUSTAMANTE collected approximately $116,000 from Individual C, Judge Susan Gibson of the Circuit Court for the Commonwealth of Kentucky authorized a warrant to search the residence of Individual A, in Shepherdsville, Kentucky. Law enforcement executed the search warrant the following day. During the search, law enforcement found approximately 15 kilograms of cocaine, approximately $516,000 in U.S. currency, and approximately nine firearms.

99.     Based on my training, experience, and familiarity with this case –
including prior and subsequent intercepted calls between BUSTAMANTE and
Individual C; surveillance; and the seizure of approximately 15 kilograms of cocaine
and large amounts of cash from Individual C's residence about one month after he
met with BUSTAMANTE – I believe that Individual C was a narcotics trafficker and
the approximately $116,000 that Individual C delivered to BUSTAMANTE about one
month before the seizure were narcotics proceeds.

**3.     BUSTAMANTE and OWEN Launder Approximately $100,000 that BUSTAMANTE Collects from a Narcotics Trafficker in Columbus, Ohio (April 15, 2019)**

100.     As noted above, during an April 14, 2019 call with Marquez,
BUSTAMANTE stated that he planned to go to Columbus, Ohio, to collect additional
narcotics proceeds after collecting proceeds in Louisville.

101.     On or about April 14, 2019, at approximately 9:56 a.m. (TP7 Session
2257), BUSTAMANTE, using Target Phone 7, had a phone call with Individual E,
using Individual E Phone 1. During that call:

a.     Individual E said, "Pablo told me to call you." BUSTAMANTE
asked, "Are you in Ohio?" Individual E responded, "Yes." BUSTAMANTE said "I need
to confirm your code [dollar bill serial number, to vouch for Individual E's
trustworthiness]," and asked, "[D]o you have the code with you? It ends in 42F?"
Individual E said, "Yeah, it looks like it." BUSTAMANTE stated, "It's K47825242F."

b.     BUSTAMANTE told Individual E that he would head to
Individual E the following afternoon. BUSTAMANTE asked, "Okay, how much is it?"

72

Individual E responded, "I think it's 100 dollar receipt [$100,000 in narcotics proceeds] or something like that." BUSTAMANTE confirmed, "Perfect."

102. Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded calls and meetings between BUSTAMANTE, CS2, and the UCs; information from CS1 and CS2; prior and subsequent intercepted calls between BUSTAMANTE and Individual E; the seizure of approximately 30 grams of cocaine from Individual E less than one month after he met with BUSTAMANTE; and the subsequent deposit of $94,000 into the UC Bank Account after meeting with Individual E – I believe that, in these phone calls, (a) BUSTAMANTE arranged to collect approximately $100,000 in narcotics proceeds from Individual E in Columbus, Ohio; and (b) Individual E and BUSTAMANTE exchanged the serial number of a United States one dollar bill because they did not know each other and their respective associates had instructed them to use that serial number as a code to confirm their identities and vouch for their trustworthiness in conducting the illicit transaction.

103. On April 15, 2019, at approximately 10:59 a.m. (TP7 Session 2466), BUSTAMANTE, using Target Phone 7, had a call with OWEN, who was using Target Phone 8. During the conversation, OWEN asked, "Are you in Shepherdsville [location where BUSTAMANTE collected narcotics proceeds from Individual C] still?" BUSTAMANTE responded, "I'm actually waiting for the cab to take me to Louisville, but you're actually really good at finding the schedule [travel schedule]. See if you can help me getting a schedule from Louisville to Columbus [to collect narcotics

73

proceeds from Individual E]." OWEN stated, "Okay, you want the Greyhound that goes to Cincinnati." BUSTAMANTE responded, "Yeah, of course, I'll take the Greyhound." OWEN stated, "There is one [Greyhound bus] leaving... I'll get it for you. And you're going to [departing from] Louisville, right?" BUSTAMANTE stated, "Yeah, I'm going there now."

104.   On or about April 15, 2019, at approximately 1:50 p.m. (TP7 Session 2553), BUSTAMANTE, using Target Phone 7, had a phone call with Individual E, who was using Individual E Phone 1. During the call, BUSTAMANTE said, "I'm going to be there like in one hour 20 minutes in downtown Columbus. I'll send you my location so we can meet there [to complete narcotics proceeds hand off], you know?"

105.   On April 15, 2019, at approximately 3:05 p.m. (TP7 Session 2590), BUSTAMANTE using Target Phone 7, sent a text message to Individual E, who was using Individual E Phone 1. In this message, BUSTAMANTE stated, "920 S. High Street Columbus, Ohio [meeting location for money hand off]." According to an open source search, a hotel is located at that address.

106.   On or about April 15, 2019, at approximately 4:29 p.m. (TP7 Session 2639), OWEN, using Target Phone 8, had a call with BUSTAMANTE, using Target Phone 7. During the conversation:

a.      BUSTAMANTE stated, "I actually got a gun pulled out on me two days ago because one of the guys that we're trying to keep the big [money laundering] contract with, which is the 100 grand [$100,000 in narcotics proceeds] that we're getting in Chicago, he goes, 'So they told me you're working for the DEA [as a

confidential source].' I'm like, 'What the fuck? Okay. Look, call your contact from your... you guys are from this area, right?' He goes, 'Yeah.' [I say], 'You know such and such?' He goes, 'Yeah.' [I said] 'Okay, call him.' He goes, 'I have his cell phone.' I'm like, 'So do I. You want to use my phone or you want to use your phone?' And then, the guys from Colombia [Colombia-based drug traffickers] go, 'What the hell is wrong with you, man? We've known Erick [BUSTAMANTE] forever. No, it's just that he's a square and he talks funny, but that's it.' But trust me man it's getting very complicated but everybody that's not part of Lalo's group are still looking at us."

    b.    BUSTAMANTE asked for OWEN's assistance making travel arrangements for BUSTAMANTE to travel to Chicago from Columbus, where BUSTAMANTE was collecting narcotics proceeds. Specifically, BUSTAMANTE asked OWEN, "Can you do me a favor? Can you help me find a ticket or a best route to get to Chicago from Columbus?" OWEN responded, "Amtrak goes from there. Hold on. I'll get it." OWEN said, "I have to get off the phone soon because I need to catch the banker [u/i] calls . . . you know what, you can talk to me since I can do it right here. Hold on." BUSTAMANTE answered, "No, no. I'll let you go so you could do that, because the guy's actually coming over right now to drop off the other part [a money courier is going to drop off narcotics proceeds to BUSTAMANTE momentarily]." OWEN said, "Okay, well you go do your thing and I'll send it to you through text. Don't worry about it."

107.    Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications; consensually recorded

calls between BUSTAMANTE and CS2; information from the UCs, CS1, and CS2; the prior seizure of kilogram quantities of heroin from HERNANDEZ, and the subsequent seizure of approximately $311,980 from Wire Transfer Business A– I believe that, during this call over the **Target Phones**, BUSTAMANTE told OWEN that (a) an individual associated with Columbia-based drug traffickers, for whom BUSTAMANTE planned to launder $100,000 in narcotics proceeds, had pulled a gun on BUSTAMANTE, accusing him of working for the DEA; (b) BUSTAMANTE had his accuser contact their Columbia-based associates, who in turn vouched for BUSTAMANTE's trustworthiness as a money launderer whom they have worked with "forever;" and (c) BUSTAMANTE asked OWEN to help him make travel arrangements for BUSTAMANTE to travel from Columbus, where he was expecting to collect approximately $100,000 of narcotics proceeds, to Chicago, where he would deposit the proceeds.

108. On April 15, 2019, at approximately 4:39 p.m. (TP7 Session 2643), BUSTAMANTE, using Target Phone 7, spoke with Individual E, who was using Individual E Phone 1. During the conversation, BUSTAMANTE stated, "Okay, are you downstairs or do you want to come up [to BUSTAMANTE's hotel room at 920 S. High Street in Columbus]?" Individual E responded, "Oh, all right. I'll come in. If you want, come look out for me down here."

109. At approximately 4:41 p.m. (TP7 Session 2646), BUSTAMANTE, using Target Phone 7, spoke with Individual E, who was using Individual E Phone 1. During the conversation, BUSTAMANTE said, "I'm coming down right here through

the entrance by the [hotel] office." MONTES replied, "I'm outside of the office, inside of this thing…it's [narcotics proceeds] there."

110. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted calls between BUSTAMANTE and Individual E; the seizure of approximately 30 grams of cocaine from Individual E less than one month after he met with BUSTAMANTE; and the subsequent deposit of $94,000 into the UC Bank Account after meeting with Individual E – I believe that BUSTAMANTE (a) met with, and collected approximately $100,000 in narcotics proceeds from, Individual E at the Columbus hotel located at 920 S. High Street; and (b) collected this money from Individual E for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

111. On or about May 10, 2019, less than one month after BUSTAMANTE collected approximately $100,000 from Individual E, law enforcement conducted a traffic stop on Individual E while he was driving near Springfield, Ohio. During the stop, law enforcement recovered approximately 30 grams of cocaine from Individual E and a cellular telephone assigned the same phone number that Individual E had previously used to coordinate the delivery of approximately $100,000 to BUSTAMANTE (Individual E Phone 1).

112. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted calls between BUSTAMANTE and Individual E and the seizure of approximately 30 grams of cocaine from Individual E

less than one month after he met with BUSTAMANTE in Columbus – I believe that Individual E was a narcotics trafficker and the approximately $100,000 that Individual E delivered to BUSTAMANTE on April 15, 2019 were narcotics proceeds.

**4.    BUSTAMANTE, with Assistance from OWEN, Deposits Approximately $120,000 of the Narcotics Proceeds that He Collected in Kentucky and Ohio at Wire Transfer Business A in Chicago (April 16, 2019)**

113.    On April 15, 2019, at approximately 8:14 p.m. (Session 2748), BUSTAMANTE, using Target Phone 7, had a call with OWEN, who was using Target Phone 8. During the conversation, OWEN helped BUSTAMANTE book ground transportation to Chicago from Columbus. Specifically:

a.    BUSTAMANTE stated, "Yeah, 45 minutes. But then at 4:55, there's a Greyhound that goes to Chicago, Illinois. Do you know about how long that will take?"

b.    Later during the conversation OWEN stated, "I didn't know which way you were going. To me, it was to Cleveland, and then Cleveland has a straight Amtrak across to Chicago, 'cause that's where the route was. And I sent you a picture of the route. But let me re-do Cleveland. I just pulled over. So, I'm on a... you know, I'm not on a three way [telephone call], so I'll have to call you right back when I look at the route. 'Cause I don't have the [u/i]." BUSTAMANTE responded, "No, no. I'm going to take off now so I can go and ask these questions in person. So, the question is, I need to tell Lalo something and he wants to talk to you, so do you have 3 minutes?"

114.  Based on my training, experience, and familiarity with this case – including information from CS1, CS2, UC1, UC2, and UC3; prior and subsequent intercepted calls between BUSTAMANTE, Individual C, and Individual E; the seizure of approximately wholesale quantities of cocaine from both Individual C and Individual E less than one month after they met with BUSTAMANTE; and the subsequent deposit of $94,000 into the UC Bank Account and the on May 17, 2019 recovery of large amounts of cash associated with BUSTAMANTE at Wire Transfer Business A – I believe that OWEN arranged BUSTAMANTE's travel to Chicago to facilitate the subsequent deposit of approximately $216,000 in narcotics proceeds, which BUSTAMANTE had collected in Kentucky and Ohio on behalf of a Mexico-based drug trafficker (Lalo).

115.  On April 15, 2019, at approximately 10:03 p.m. (TP7 Session 2772), BUSTAMANTE, using Target Phone 7, had a call with OWEN, who was using Target Phone 8. During the conversation:

a.    BUSTAMANTE stated, "I'm leaving right now at 11:20 [p.m.]. No, I'm not in Cleveland. I'm in Columbus." OWEN responded, "Oh. Are you going through Cleveland or you going straight to [Chicago]?" BUSTAMANTE stated, Nope, straight to Chicago. I'll be there by 8:30 [a.m.]."

b.    Later during the conversation OWEN stated, "8:30 [u/i] central time. Okay, But the pick-ups [of narcotics proceeds in Kentucky and Ohio] went okay?" BUSTAMANTE responded, "Yeah, I mean, we don't make any money [earn a commission] off of it." OWEN stated, "I know. We're not making any money off

79

anything with Lalo [Mexico-based source of supply]. I just want to give him his money back [pay back the debt from the previous theft of narcotics proceeds by BUSTAMANTE and Individual A, because I rather get a few dollars, but as far as his stuff goes we don't make any money anyway, right?"

        c.    Later during the conversation BUSTAMANTE stated, "Yeah, I need to put 100 [$100,000 in narcotics proceeds] in Houston [into the UC Bank Account], then 120 [$120,000 in narcotics proceeds] in Chicago. It's gonna spread out a lot. I'm just really tired, and I don't care what's gonna happen. But I'm gonna be in California on Friday, and I won't be available until Sunday, 'cause I need to recharge. This [conducting numerous financial transactions involving illicit proceeds] is really, really stressful."

        116.    Based on my training, experience, and familiarity with this case – including information from CS1, CS2, UC1, UC2, and UC3; prior and subsequent intercepted calls between BUSTAMANTE, Individual C, and Individual E; the seizure of approximately wholesale quantities of cocaine from both Individual C and Individual E less than one month after they met with BUSTAMANTE; and the subsequent deposit of $94,000 into the UC Bank Account and the on May 17, 2019 recovery of large amounts of cash associated with BUSTAMANTE at Wire Transfer Business A – I believe that BUSTAMANTE and OWEN (a) agreed to collect and launder narcotics proceeds that belonged to Lalo and were located in Kentucky and Ohio because they owed a large, preexisting debt to Lalo – the theft of approximately $1.8 million worth of narcotics proceeds by BUSTAMANTE and Individual A; (b)

acknowledged that the BUSTAMANTE MLO would not making any commission off of these pickups on Lalo's behalf; and (c) discussed BUSTAMANTE's plan to deposit $120,000 of the proceeds that he collected in Kentucky and Ohio at Wire Transfer Business A in Chicago, and $100,000 in narcotics proceeds into the UC Bank Account once he returned to Houston.

117. On April 16, 2019, at approximately 2:59 p.m., surveillance observed BUSTAMANTE enter the Cermak Fresh Market located at 5220 South Pulaski Road in Chicago. As discussed below, agents later learned that, within this market, there was a wire transfer business ("Wire Transfer Business A"), at which BUSTAMANTE had deposited large sums of cash on multiple occasions. BUSTAMANTE left the market in which Wire Transfer Business A was located moments later, entered a ride share vehicle, and traveled to a hotel located in Burbank, Illinois.

118. As discussed in greater detail below, on or about May 17, 2019, agents interviewed a Wire Transfer Business A employee ("Employee A"). During this interview, Employee A stated that she had worked at Wire Transfer Business A for approximately three weeks and that during that time, a man she knew as "Erick" (later identified as BUSTAMANTE) had visited the store and dropped off a package or bag at least three times, including once prior to May 7, 2019.[28] Employee A stated that, for each of BUSTAMANTE's deliveries, a man in Mexico whom she knew only as "Oscar" directed her to deposit BUSTAMANTE's bag in one of the Wire Transfer

---

[28] Employee A also had information regarding BUSTAMANTE delivery of a bag or package on two other occasions (a total of three), on May 7 and 17, 2019. Those deliveries are discussed in detail below.

Business A safes. Employee A identified at least four safes in which she had placed BUSTAMANTE's bags at Oscar's direction.

119. As discussed in greater detail below, on or about May 17, 2019, Magistrate Judge Sidney I. Schenckier authorized a warrant to search Wire Transfer Business A. During this search, agents found a total of approximately $311,980, in the four safes associated with BUSTAMANTE.

120. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications discussing the collection of narcotics proceeds in Kentucky and Ohio, the subsequent seizure of approximately $311,980 from Wire Transfer Business A, information subsequently obtained from a Wire Transfer Business A employee, and the subsequent deposit of $94,000 into the UC Bank Account, I believe that BUSTAMANTE deposited approximately $120,000 of the narcotics proceeds that he had collected in Kentucky and Ohio at Wire Transfer Business A in Chicago, for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

### 5. BUSTAMANTE Launders Approximately $94,000 in Narcotics Proceeds through the UC Bank Account (April 17, 2019)

121. On or about April 17, 2019, at approximately 9:21 a.m. (TP7 Session 2957), BUSTAMANTE, using Target Phone 7, called UC3. During this call, BUSTAMANTE stated, "I'm just landing in Houston now, so a quick reminder I'll be dropping in about 113 [depositing $113,000 of the narcotics proceeds that he had collected in Kentucky and Ohio, into the UC Bank Account] today." Later during the conversation BUSTAMANTE stated, "And let me know on the timing on the return

and I'll give you the account numbers [to which BUSTAMANTE would instruct UC3 to transfer the funds]. It's to a Chase account here in the States."

122.   On or about April 17, 2019, at approximately 10:53 a.m. (TP7 Session 2964), BUSTAMANTE, using Target Phone 7, called UC3. During the conversation, BUSTAMANTE told UC3 that BUSTAMANTE would be going to a Bank of America branch location in Katy, Texas to deposit $94,000. BUSTAMANTE stated, "I'm about to give you the branch herein Kitty, I mean Katy, Texas [where BUSTAMANTE will deposit narcotics proceeds into the UC Bank Account], which is a little suburb of Houston." BUSTAMANTE continued, "And I'll give you the branch number, and it's gonna be 94,000 [$94,000]. I didn't want to overwhelm it [draw the attention of bank regulators or law enforcement to the illicit proceeds deposited into the UC Bank Account], so keep it under 100 [$100,000]."

123.   On or about April 17, 2019, at approximately 2:27 p.m., BUSTAMANTE, using Target Phone 7, texted UC3 an image of a Bank of America customer receipt showing a deposit of $94,000 into the UC Bank Account on April 17, 2019 at 2:27 p.m. According to bank records for the UC Bank Account, on April 17, 2019, the UC Bank Account received a $94,000 cash deposit from a branch in Katy Texas.

124.   Agents conducted physical surveillance and observed BUSTAMANTE enter the bank branch in Katy, Texas, on April 17, 2019. Agents later obtained surveillance footage from the same bank branch in Katy, Texas, where the $94,000 cash deposit was made. In the video, BUSTAMANTE is captured removing a large

amount of U.S. currency from a backpack and giving the money to the bank teller who processed the $94,000 deposit.

125.    Based on my training and experience and knowledge of the investigation, including prior and subsequent communications between BUSTAMANTE and UC3, Individual C, and Individual E; information provided by CS2; and associated narcotics seizures, I believe that BUSTAMANTE deposited the $94,000 into the UC Bank Account for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

126.    On April 19, 2019, at approximately 1:46 p.m., BUSTAMANTE, who was using email address ebjet2014@yahoo.com,[29] sent an email to UC3. In this email, BUSTAMANTE sent detailed wiring instructions on where UC3 should wire the proceeds. In the email, BUSTAMANTE listed the name of the accountholder, the address, bank, account and routing numbers, and the amount to be transferred: $91,650. According to this email, the transferee account was a Chase Bank account associated with Company B in Miami, Florida (the "Company B Bank Account"). In the email, BUSTAMANTE broke down the transaction: "Deposit: $94,000. Commission: $2,350 (2.5%). Return: $91,650." Agents thereafter transferred $91,650

---

[29] BUSTAMANTE provided this email address to UC3 as his own, and in prior calls said that he would send UC3 an email from that address, and subsequently UC3 received an email from that address. Additionally, BUSTAMANTE occasionally referred to himself as "Erick" in those emails.

from the UC Bank Account to the Company B Bank Account as BUSTAMANTE instructed.

**6. BUSTAMANTE and OWEN Launder $70,000 of Narcotics Proceeds, which BUSTAMANTE Collected in Boston and Deposited at Wire Transfer Business B in Grand Rapids (April 25–27, 2019)**

127. On or about April 24, 2019, at approximately 10:08 p.m., (TP7 Session 4174), BUSTAMANTE, using Target Phone 7, called UM7-4174. UM7-4174 stated that he was "with Abraham," and "trying to coordinate something for tomorrow like at 7:00 or 8:00 at night in Dorchester." BUSTAMANTE asked him to confirm his "password," which ended "with 9801L." After discussing the location of their meeting, UM7-4174 asked, "You're a trustworthy person, right? Because you're going to see where my office is at." BUSTAMANTE assured him that he was and asked "how many units is it?" UM7-4174 responded, "70 bucks [$70,000]."

128. On or about April 25, 2019, at approximately 8:46 a.m., (TP7 Session 4217), BUSTAMANTE, using Target Phone 7, sent a text message to UM7-4174, stating "I arrive at 4pm. Is it ok to meet at 4:30-5pm??" UM7-4174 responded, "That's fine" (TP7 Session 4221). Later, at approximately 2:56 p.m. (TP7 Session 4263), UM7-4174 texted an address to BUSTAMANTE, using Target Phone 7.

129. On or about April 25, 2019, at approximately 4:08 p.m., (TP7 Session 4302), UM7-4174 called BUSTAMANTE, who was using Target Phone 7. BUSTAMANTE advised that he was "outside," "in a van but I'm here walking up to the door." UM7-4174 said, "Tell the van to leave."

85

130. On April 25, 2019, at approximately 4:08 p.m., law enforcement conducting physical surveillance at the address that UM7-4174 had provided to BUSTAMANTE observed BUSTAMANTE enter the address, carrying a backpack. BUSTAMANTE was observed exiting the address approximately 10 minutes later, carrying the same backpack, which appeared at that point to be heavy.

131. Based on my knowledge of the investigation, including the intercepted communications described above, the physical surveillance of BUSTAMANTE entering the premises in Boston, BUSTAMANTE's subsequent movement to Wire Transfer Service B, the subsequent seizure of approximately $180,925 from Wire Transfer Service B, and subsequent intercepted communications, I believe that BUSTAMANTE arranged to meet an individual in Dorchester, Massachusetts, to pick up $70,000 in narcotics proceeds; BUSTAMANTE did collect the narcotics proceeds; and the individual delivering the narcotics proceeds was nervous about law enforcement detecting his illegal activities.

132. On or about April 25, 2019, at approximately 10:10 p.m. (TP7 Session 4412), BUSTAMANTE, using Target Phone 7, talked with OWEN, using Target Phone 8 to discuss making travel arrangements for BUSTAMANTE to travel to Detroit. OWEN said, "So I just sent it to you and I think you get there [Detroit]...it's 12:57 p.m. [on April 26, 2019] and I think you get there at 5:50 [a.m.] or 7:50 [a.m. EST] [on April 27, 2019] on Amtrak." BUSTAMANTE said, "Okay, I get there on Saturday then?" OWEN confirmed, "Yeah, Saturday morning, early." BUSTAMANTE said, "Okay, sounds good." OWEN asked, "Are you trying to put it

[narcotics proceeds collected in Boston] in Huntington [BARTON's Huntington IOLTA account or Compliance Paymaster account at Huntington Bank] or anywhere?" BUSTAMANTE replied, "I have to give it to one of Lalo's contacts. Cool, awesome. Thank you, man."

133. On April 27, 2019, at approximately 8:16 a.m., law enforcement conducting physical surveillance observed BUSTAMANTE at the Detroit Amtrak Station, carrying a backpack. Surveillance followed BUSTAMANTE as he entered a cab, which took BUSTAMANTE to a Wal-Mart in Dearborn, Michigan, and then brought BUSTAMANTE back to the Detroit Amtrak station approximately one hour later. BUSTAMANTE was observed entering a fast food restaurant across the street from the Amtrak Station, and then returning to the station around 10:04 a.m. At approximately 10:39 a.m., surveillance observed BUSTAMANTE, still carrying his backpack, board an Amtrak train bound for Kalamazoo, Michigan.

134. On April 27, 2019, at approximately 1:40 p.m., law enforcement conducting physical surveillance observed BUSTAMANTE exit the Amtrak train in Kalamazoo, Michigan, carrying a black backpack. Approximately twenty minutes later, BUSTAMANTE was observed boarding a bus bound for Grand Rapids, Michigan.

135. On April 27, 2019, at approximately 3:06 p.m., surveillance observed the bus arrive at the bus station in Grand Rapids, Michigan. BUSTAMANTE was observed exiting the bus carrying a black backpack. At approximately 3:20 p.m., surveillance observed BUSTAMANTE enter a taxi, which drove to a wire transfer

service located at 2164 Division Avenue ("Wire Transfer Business B"). BUSTAMANTE was observed entering Wire Transfer Business B with his backpack, exit the business approximately 5 minutes later, and re-enter the taxi, which had been waiting for him.

136.    On or about April 27, 2019, at approximately 2:11 p.m., BUSTAMANTE, using Target Phone 7, had a phone conversation with OWEN, using Target Phone 8. During the conversation, BUSTAMANTE advised that he was in Grand Rapids, Michigan, but would head to the airport "as soon as he makes the drop." OWEN asked if BUSTAMANTE had already picked up in Detroit to drop off. BUSTAMANTE responded that he arrived to Detroit and dropped, and picked up again and now was in Grand Rapids dropping off. BUSTAMANTE further advised that "this is Lalo's stuff."

137.    Based on my training and experience, and knowledge of the investigation, including prior and subsequent intercepted communications, and the subsequent seizure of approximately $180,925 from Wire Transfer Business B on May 17, 2019, I believe that BUSTAMANTE collected approximately $70,000 of narcotics proceeds in Boston on behalf of Lalo, then carried those proceeds to Wire Transfer Business B, where he left them, as instructed by Lalo.

### 7.    BUSTAMANTE Collects Narcotics Proceeds in Aurora, Illinois, and Deposits them at Wire Transfer Business A in Chicago (May 7, 2019)

138.    On May 6, 2019, at approximately 4:11 p.m. (TP7 Session 5342), BUSTAMANTE, using Target Phone 7, received an incoming text message from the

Expedia travel service. The text message said, "Hello Erick J Bustamante. Your Delta flight from Los Angeles to Chicago on May 7, 2019 at 6:15 AM is now confirmed[.]"

139.   On May 7, 2019, at approximately 12:46 p.m. (TP7 Session 5407), BUSTAMANTE, using Target Phone 7, had a phone call with BARTON, using Barton Phone 1. During that phone call, BUSTAMANTE advised, "I just landed in Minnesota. I'll be here for 40 minutes and then I'm flying to Chicago." BUSTAMANTE continued, noting that "I'm landing in Midway, not O'Hare." BARTON asked, "Are you making a deposit [of narcotics proceeds into a BARTON controlled bank account] today?" BUSTAMANTE answered, "No, most likely it's going to be tomorrow."

140.   Later that day, at approximately 1:59 p.m. (TP7 Session 5416), BUSTAMANTE, using Target Phone 7, had a phone call with Individual J, using Individual J Phone 1. During that conversation with Individual J, BUSTAMANTE had a separate conversation in the background with an unidentified individual believed to be a money courier based in Illinois. BUSTAMANTE's side of the background conversation was also intercepted. In that background conversation:

a.   BUSTAMANTE said, "Yes, how are you? [pause]. . . Let me confirm the code [dollar bill serial number, to vouch for trustworthiness] for you. Do you have it in front of you? [pause] It's H75019330A. Okay, perfect. . . Do you know where Midway is at? . . . I'm going to be near that area. [Pause]. Listen, if I give you my location, can we get close [complete the narcotics proceeds hand off] there? [Pause]."

    b.    BUSTAMANTE continued, "How many units [amount of narcotics proceeds to be delivered] are they? [Pause]. How much are you going to hand over? . . . Yeah, they told me that it was going to be 40 [$40,000], but I don't know if that sounds right to you. Can you please check on that, so we can verify it with the office, please?"

    c.    BUSTAMANTE continued, "I'll be there around Midway at 4:00. And if you want, I'll call you back, okay?" BUSTAMANTE apologized to Individual J, who observed, "Taking care of business." BUSTAMANTE replied, "It's not for me though. That's the bad thing. It's for the fucking Mexicans [Lalo and DTO associates]." Individual J said, "Yeah, how are you doing with that shit? Are you almost done paying off your debt [to Lalo and DTO associates]?"

141.  Based on my training and experience and knowledge of the investigation, including prior and subsequent communications, information provided by CS2, physical surveillance of BUSTAMANTE on May 7, 2019, and the subsequent seizure of approximately $311,980 from Wire Transfer Business A on May 17, 2019, I believe that BUSTAMANTE (a) made arrangements to collect approximately $40,000 in narcotics proceeds from an Illinois-based money courier; (b) BUSTAMANTE and the courier exchanged the serial number of a United States one dollar bill because they did not know each other and their respective associates had instructed them to use that serial number as a code to confirm their identities and vouch for their trustworthiness in conducting the illicit transaction; and (c) told

Individual J that he agreed to collect money from the Illinois-based courier for the "Mexicans," meaning Lalo, to whom BUSTAMANTE owed money.

142. On May 7, 2019, at approximately 4:32 p.m., surveillance observed BUSTAMANTE exit a plane at Midway Airport, depart the airport in a ride share vehicle, and travel to the Chicago Premium Outlet Mall near Aurora, Illinois. At approximately 6:12 p.m., surveillance observed BUSTAMANTE exit the car and enter the mall.

143. At approximately 6:39 p.m., surveillance observed BUSTAMANTE meet with an unknown man, who handed BUSTAMANTE a shopping bag, which BUSTAMANTE placed into his backpack before exiting the mall.

144. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications discussing BUSTAMANTE's collection of narcotics proceeds in various locations, the subsequent seizure of approximately $311,980 from Wire Transfer Business A, and information subsequently obtained from Wire Transfer Business A showing that BUSTAMANTE made a deposit into a safe marked "CSU 23" at that business later the same day – I believe that, during this meeting with the unidentified man at the Aurora outlet mall, BUSTAMANTE collected narcotics proceeds from the unidentified man, for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

145. At approximately 6:47 p.m., surveillance observed BUSTAMANTE depart the Aurora outlet mall in what agents believe was a ride share vehicle and

travel to the Cermak Market where Wire Transfer Business A is located (the same location that BUSTAMANTE visited on April 16, 2019, after collecting narcotics proceeds in Kentucky and Ohio). Surveillance observed BUSTAMANTE enter the market at approximately 7:32 p.m., and exit the market and depart the area moments later.

146. At approximately 8:14 p.m., BUSTAMANTE, using Target Phone 7, spoke with OWEN, using Target Phone 8. During the conversation, OWEN asked, "Did everything go okay with Lalo's guys picking up [collecting narcotics proceeds]?" BUSTAMANTE answered, "Yeah, I just dropped it off already."

147. As discussed in greater detail below, agents later obtained and viewed Cermak Market surveillance footage from May 7, 2019. The surveillance footage from that day captured BUSTAMANTE (a) entering Wire Transfer Business A, carrying a black backpack that matched the appearance of the backpack into which BUSTAMANTE had earlier placed the shopping bag that he had received from the unknown man at the outlet mall; and (b) removing a black plastic bag from the backpack; and (c) handing the black plastic bag to Employee A (the aforementioned Wire Transfer Business A employee), who then placed the black plastic bag in one of the safes.

148. As noted above and discussed in greater detail below, agents later interviewed Employee A. During this interview, Employee A stated that she placed the bag that BUSTAMANTE delivered to Wire Transfer Business A on May 7, 2019, in a safe marked "CSU23."

92

149.   As noted above and discussed in greater detail below, on or about May 17, 2019, agents executed a court-authorized search warrant at Wire Transfer Business A. During this search, agents found a black plastic bag, containing United States currency, in the safe marked "CSU23" (the safe into which Employee A had deposited the bag that BUSTAMANTE delivered on May 7, 2017).

150.   Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications discussing BUSTAMANTE's collection of narcotics proceeds in various locations, information subsequently obtained from Wire Transfer Business A showing that BUSTAMANTE made a deposit into at that business later the same day, and the subsequent seizure of currency from a safe marked "CSU 23" at Wire Transfer Business A – I believe that BUSTAMANTE (a) collected approximately $40,000 from an unknown man at the Aurora outlet mall; (b) deposited those proceeds at Wire Transfer Business A later that same day on behalf of a Mexico-based drug trafficking organization; and (c) both collected the money at the mall and deposited the money at Wire Transfer Business A for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

### 8.   BUSTAMANTE Collects $115,000 of Narcotics Proceeds in Detroit and Deposits Them at Wire Transfer Service B (May 13, 2019)

151.   On May 11, 2019, at approximately 11:29 a.m. (TP7 Session 5898) BUSTAMANTE, using Target Phone 7, spoke with FNU LNU ("UF7-5898"). During the conversation, UF7-5898 stated, "Yes, I'm calling on behalf of Jose." BUSTAMANTE responded, "Give me one second. Let me check the code. Only to

confirm, do you have the code with you? [the serial number of a dollar bill, which is used to confirm the trustworthiness and identity of the otherwise anonymous individual from whom they will collect illicit proceeds]" UF7-5898 stated," Yes, go ahead." BUSTAMANTE responded, "Okay, it's: K81155323F." UF7-5898 stated, "Uh-huh [affirming]." Later during the conversation BUSTAMANTE asked, "How many units [amount of narcotics proceeds] are they?" UF7-5898 responded, "I can say between 100 and 120 [$100,000 and $120,000]." BUSTAMANTE responded, "Okay, perfect. I only have to report to the office [Mexico-based source of supply], so they can jot that down." Later during the conversation, BUSTAMANTE asked, "Are right in Detroit?" UF7-5898 stated, "Yes, uh, I'm in the outskirts, but I'll meet you in Detroit." BUSTAMANTE responded, "Perfect."

152. On May 13, 2019, at approximately 7:27 a.m. (TP7 Session 6039), BUSTAMANTE, using Target Phone 7, sent a text message to UF7-5898. During the text conversation, BUSTAMANTE stated, "Good morning, on behalf of Jose." At approximately 7:28 a.m., BUSTAMANTE sent additional text messages to UF7-5898, stating, "I'll be in Detroit at 11AM. Due to the storms there's a delay with the...flights. Sorry."

153. On May 13, 2019, at approximately 9:27 a.m. (TP7 Session 6063), BUSTAMANTE, using Target Phone 7, sent a text message to UF7-5898. BUSTAMANTE stated, "Hello, I'm already here. Can you send a location, so I head out to you please?"

154. On May 13, 2019, at approximately 11:03 a.m. (TP7 Session 6101), UF7-5898 sent a text message reply, stating "6130 martin 48210. Let me know how much time you'll be there."

155. On May 13, 2019, at approximately 11:02 a.m., law enforcement conducting physical surveillance observed BUSTAMANTE exit a plane at Detroit Metro Airport, carrying a backpack. At approximately 12:15 p.m., surveillance observed BUSTAMANTE enter a ride share vehicle at the airport. At approximately 12:36 p.m. EST, surveillance observed BUSTAMANTE arrive in the vicinity of 6130 Martin, in Detroit, Michigan. Surveillance units saw BUSTAMANTE exit the ride share and walk towards a single-family residence in the area provided by UF7-5898.

156. On May 13, 2019, at approximately 11:39 a.m. [12:39 p.m. EST] (TP7 Session 6115), BUSTAMANTE, using Target Phone 7, spoke with UF7-5898, who was using telephone number (313) 296-8673. During the conversation, BUSTAMANTE stated, "Yes. Hello." UF7-5898 responded, "Are you in the dark vehicle?" BUSTAMANTE stated, "Yes." UF7-5898 responded, "Oh, all right. There where the car that just went through, get in." BUSTAMANTE stated, "Okay, I'll go out on foot, okay?" UF7-5898 responded, "You're going on foot? Well, do you have something to put in or what [does BUSTAMANTE have a bag to put the narcotics proceeds in]?" BUSTAMANTE stated, "Yes, of course." Later during the conversation, BUSTAMANTE asked, "How many units [narcotics proceeds]?" UF7-5898 responded, "Just 5." BUSTAMANTE stated, "How much is the total weight [narcotics proceeds amount] though?" UF7-5898 responded, "It's 115 [$115,000]. Later BUSTAMANTE

95

stated, "All right, thanks. One second. [Pause] And we just send it to the office [Mexico-based source of supply], and then we're good."

157. At approximately 12:40 p.m., surveillance observed a gold-colored minivan occupied by two unknown male black subjects back into the driveway of a single-family residence located approximately 1 house to the north of 6130 Martin. Surveillance observed a grey-colored Ford Explorer occupied by an unknown Hispanic female and an unknown male black subject park across the street of the residence that the gold colored minivan pulled into. Surveillance observed BUSTAMANTE walk towards the rear of the single family residence on foot after the Ford Explorer pulled in. Surveillance units noticed that BUSTAMANTE was carrying a black colored backpack. At approximately 12:43 p.m., surveillance observed BUSTAMANTE leave the rear of the residence carrying his backpack, re-enter the ride share and leave the area. At approximately 1:05 p.m. [EST], surveillance observed BUSTAMANTE arrive at a hotel located in Dearborn, Michigan.

158. On May 13, 2019, at approximately 12:03 p.m. [1:03 p.m. EST] (TP7 Session 6120) BUSTAMANTE, using Target Phone 7, spoke with OWEN who was using Target Phone 8. During the conversation, BUSTAMANTE stated, "I just saw one of the contacts [narcotics-proceeds money couriers] here in Detroit then we're heading up to Grand Rapids so I'm gonna be leaving in about an hour and a half." OWEN responded, "And what is that for? Lalo [Mexico-based DTO associate]?" BUSTAMANTE stated, "Yeah, exactly."

96

159.  On May 13, 2019, at approximately 12:23 p.m. (TP7 Session 6122) BUSTAMANTE, using Target Phone 7, sent a text message to Robert LNU who was using telephone number (248) 830-9796. During the text conversation, BUSTAMANTE stated, "Hi Robert, the address is * 2164 Division Ave S, Grand Rapids, MI 49507 * [Wire Transfer Business B]."

160.  On May 13, 2019, at approximately 1:29 p.m. (TP7 Session 6132), BUSTAMANTE, using Target Phone 7, had a phone call with Robert LNU, who was using telephone number (248) 830-9796. During the conversation, BUSTAMANTE said, "I sent you the address, to Grand Rapids." BUSTAMANTE said, "I already went to the ATM, so I have your cash here." Robert LNU asked, "Now, am I bringing you back, too?" BUSTAMANTE replied, "No, no. I'm going to stay there to work." Based on my training and experience, prior and subsequent communications, and the physical surveillance of BUSTAMANTE as he traveled in the Detroit area, and later to Grand Rapids, I believe that in this conversation, BUSTAMANTE hired a ride share driver to drive him to Wire Transfer Business B.

161.  At approximately 1:43 p.m., law enforcement observed BUSTAMANTE exit the hotel and enter the same ride share vehicle that had dropped him off earlier in the day.

162.  On May 13, 2019, at approximately 5:00 p.m. EST, law enforcement conducting physical surveillance observed BUSTAMANTE arrive at Wire Transfer Business B. BUSTAMANTE was observed entering Wire Transfer Business B and exiting approximately five minutes later.

97

163. Based on my training and experience, and knowledge of the investigation, including prior and subsequent intercepted communications, and the subsequent seizure of approximately $180,925 from Wire Transfer Business B on May 17, 2019, I believe that BUSTAMANTE: (a) collected approximately $115,000 of narcotics proceeds in Detroit on behalf of Lalo; (b) hired Robert LNU, a ride share driver, to take him to Grand Rapids; and (c) traveled to Grand Rapids, where BUSTAMANTE deposited the proceeds at Wire Transfer Business B.

### 9. BUSTAMANTE Collects $160,000 of Narcotics Proceeds from Individual K in Birmingham, Alabama (May 14, 2019)

164. On or about May 10, 2019, at approximately 6:58 p.m. (TP7 Session 5851), BUSTAMANTE, who was using Target Phone 7, had a conversation with Individual K, who was using Individual K Phone 1. During this call:

a. Individual K stated, "This is the right number, is this Samuel [codename to vouch for trustworthiness]?" BUSTAMANTE stated, "Samuel... give me one second. Let me check. What street/state are you calling from?" Individual K stated, "Oh, Birmingham." BUSTAMANTE stated, "Birmingham, Alabama. Give me one second. Sorry, man, I get a lot of codes and names [BUSTAMANTE has numerous contracts to launder narcotics proceeds, each with its own code name or dollar bill serial number to vouch for trustworthiness]."

b. Later during the conversation, BUSTAMANTE stated, "How many units [amount of narcotics proceeds] do you have?" Individual K responded, "Shit, actually, what it gon' be? [...] I'll just take a wild guess, [U/I] it's gon' be over... about 150 [$150,000], something like that." BUSTAMANTE stated, "No worries, but

is the code 23F [serial number from a dollar bill, particular to transaction, to vouch for trustworthiness of money courier and perhaps to serve as a receipt to the illicit money handoff]?" Individual K responded, "Uh, shit, I don't even see no code [serial number]. Nobody gave me no code. They [drug money owners] just [U/I] the number, told me to call you."

165.   Later the same day, at approximately 7:44 p.m. (TP7 Session 5865), BUSTAMANTE, using Target Phone 7, had a conversation with Individual K, using Individual K Phone 1. During this call:

a.    BUSTAMANTE stated, "Hey man, on behalf of Samuel?" Individual K responded, "Yeah." BUSTAMANTE stated, "Alright, cool. Let me confirm the code [dollar bill serial number] for you. If you have something to write it down, you could compare it. Your code is 'L' as in Larry [...] I called the office [drug money owners] right now. [...] L38027539H." Individual K responded, "Okay, I got you. " BUSTAMANTE stated, "Alright, so whoever's gonna be there, I'm gonna give them that particular ticket. Okay?" Individual K responded, "Okay. Say no more."

b.    BUSTAMANTE stated, "Just if you can, uh, just confirm how many units [total amount of narcotics proceeds to be delivered]. And we call them t-shirts or boxes [code name for narcotics proceeds]. Boxes are when the number's really high. But, uh... you know, when I say, 'how many units?' just let me know how many units so the office [drug money owners] could write it down and we'll pick that up for you guys. Alright?" Individual K responded, "Say no more. I got you."

99

166.    On or about May 13, 2019, at approximately 3:40 p.m. (TP7 Session 6178), BUSTAMANTE, using Target Phone 7, had a phone call with Individual L, who was using Individual L Phone 1. During the conversation, Individual L said, "It's a friend. We've been trying to reach you for a couple days now." BUSTAMANTE stated, "Okay, which friend?" Individual L stated, "Uh, Samuel's [Individual K's] friend." BUSTAMANTE stated, "On behalf of Samuel?" Individual L responded, "Yes." BUSTAMANTE later asked, "Yeah, but what city are you guys in because I moved already." Individual L responded, "In Birlington [ph] or Burlington [ph]." BUSTAMANTE later stated, "Okay, how many units [narcotics proceeds]?" Individual L responded, "155 [$155,000]." BUSTAMANTE stated, "Okay, let me call the office [Mexico source of supply] and I'll give you confirmation."

167.    On or about May 14, 2019, surveillance observed BUSTAMANTE arrive at the Birmingham Shuttlesworth International Airport in Alabama.

168.    On or about May 14, 2019, at approximately 10:06 a.m. (TP7 Session 6190), BUSTAMANTE, using Target Phone 7, had a conversation with Individual L, who was using Individual L Phone 2. During this call:

a.      BUSTAMANTE stated, "I already made it here at the airport [in Alabama]. And I don't know if you can give me a location [to collect narcotics proceeds from Individual K], so I can head on over to you." Individual L stated, "Well, the town is there. The black guy [Individual K] is ready to head out, because the both of us can't be out together."

     b.     Later during the conversation, Individual L stated, "I'll have him [Individual K] tell you to let you know where exactly. In Oxford [a city in Alabama]." Individual L said, "I'm from Chicago. I'm there all the time and I know it very well but I don't know if there's a lot of vigilance [heavy law enforcement presence] here [in Alabama]." BUSTAMANTE asked, "Which phone are you going to have tomorrow?" Individual L responded, "I have...this [Individual L Phone 2] is new as well and I bought 3 [other phones with different numbers], the one I called you on first [Individual L Phone 1] and this one. But I was leaving this one [phone] for the family because I'm throwing all the other ones away [to avoid law enforcement detection]."

     169.  Based on my training, experience, and familiarity with this case, including prior and subsequent intercepted communications and surveillance, I believe that, during the aforementioned call, (a) one of Individual K's associates (Individual L) arranged for BUSTAMANTE to meet with, and collect narcotics proceeds from Individual K in Oxford, Alabama; and (b) Individual L explained that he was wary of a law enforcement presence, and indicated he took steps to avoid law enforcement, for example by using multiple phones, and discarding them after certain periods of use.

     170.  On May 14, 2019, at approximately 10:12 a.m. (TP7 Session 6281), BUSTAMANTE, using Target Phone 7, had a conversation with Individual K, who was using Individual K Phone 1. During this call, BUSTAMANTE stated, "On behalf of Samuel, or...?" Individual K responded, "Uh, yeah." Later during the conversation, Individual K stated, "Get off on [U/I] like you did. Or you can put it in your GPS, get

off on exit 185 [of Interstate 20], go and take a right. It's a Walmart right there [located at 92 Plaza Lane in Oxford, the location for the money hand-off]."

171. On or about May 14, 2019, at approximately 11:03 a.m. (TP7 Session 6285), BUSTAMANTE, using Target Phone 7, spoke to BARTON, using Barton Phone 1. During the conversation, the parties discussed BUSTAMANTE's travel to Birmingham to collect narcotics proceeds for Lalo. Specifically, BARTON asked, "What are you doing in Birmingham?" BUSTAMANTE answered, "Just doing a couple of rounds [narcotics proceeds pickups] for Lalo." BARTON replied "Okay. Well, I hope it goes smoothly, because there is no money in [BARTON's account for Lalo from a previous transaction] yet."

172. Based on my training and experience, and knowledge of the investigation, including prior and subsequent intercepted communications, and bank records for BARTON's accounts, I believe that in this conversation, BARTON was advising BUSTAMANTE that BARTON had not yet received a deposit into his account, which money belonged to Lalo, and expressed the hope that BUSTAMANTE successfully completed the collection of narcotics proceeds for Lalo in Alabama, to avoid further angering Lalo.

173. At approximately 12:45 p.m., surveillance observed BUSTAMANTE arrive at a Walmart located at 92 Plaza Lane in Oxford, off exit 185 off Interstate 20. At approximately 1:03 p.m., agents observed BUSTAMANTE walk to the adjacent Walmart auto center and then toward a garden area with a pond.

174.    At approximately 1:05 p.m. (TP7 Session 6329), BUSTAMANTE, using Target Phone 7, had a phone call with Individual K, who was using Individual K Phone 1. During this call:

a.    BUSTAMANTE stated, "I'm right here at the Walmart, that's in a shopping center where the Metro PCS and the Dollar Tree is at." Individual K responded, "Okay, okay, okay." BUSTAMANTE stated, "You have it [narcotics proceeds] in the bag already, or is it loose?" Individual K responded, "It's [narcotics proceeds] already ready to go."

b.    BUSTAMANTE stated, "Okay. It was how many units [what amount of narcotics proceeds] again? I'm gonna write it down in the receipt." Individual K responded, "Uh, one-sixty, nine-twenty [$160,920]." BUSTAMANTE later stated, "one-sixty, nine-twenty [$160,920]?" Individual K responded, "No, there should have been a control number [a serial number from a dollar bill, to vouch for trustworthiness and identify owner of the drug money]. What's that control number?" BUSTAMANTE stated, "It's 7593H."

175.    Shortly thereafter, surveillance observed a black Nissan Maxima registered to Individual K approach BUSTAMANTE. BUSTAMANTE walked toward the passenger side with a backpack on his shoulder. Agents observed Individual K get out of the vehicle and open the trunk and BUSTAMANTE meet him at the rear of the car. With the trunk open, agents observed BUSTAMANTE lean toward the inside of the trunk, and then after several moments, walk away from the car with the backpack. Agents then observed Individual K pull up to BUSTAMANTE and lower

the passenger side window. BUSTAMANTE appeared to bend over to write something down. Individual K drove away and BUSTAMANTE walked to a nearby Red Roof Inn.

176.   At approximately 2:02 p.m. (TP7 Session 6342), BUSTAMANTE sent a text message to Individual K, stating, "Stack is on point [BUSTAMANTE counted the money that Individual K delivered, and confirmed that Individual K's count of $160,920 was correct]. Thanks."

177.   Based on my training, experience, and familiarity with this case, including prior and subsequent intercepted communications and surveillance, and the subsequent seizure of $311,980 from Wire Transfer Business A in Chicago, including $156,610 deposited into a safe three days after this meeting in Alabama; I believe that, during the meeting, BUSTAMANTE collected approximately $160,920 in narcotics proceeds from Individual K, for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

178.   Less than one month after BUSTAMANTE met with Individual K, on or about July 7, 2019, at approximately 9:40 p.m. CST, law enforcement attempted to conduct a traffic stop on Individual K, but he fled. Law enforcement pursued Individual K, and placed him in custody after Individual K lost control of his vehicle, which crashed into a residence. During a search of the truck, law enforcement found approximately 16 kilograms of cocaine and one kilogram of heroin. Law enforcement also found four cell phones in the truck.

179. At approximately 11:00 p.m., law enforcement executed a search warrant at Individual K's residence. During that search, agents found, among other things, approximately 2.2 kilograms of heroin, more than one kilogram of cocaine, digital scales, six cellular phones, approximately $108,000 in United States currency, one loaded revolver, and a loaded AR-15 style rifle with a 60-round drum.

180. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted calls between BUSTAMANTE and Individual K and the seizure of numerous kilogram quantities of heroin and cocaine from Individual K and his residence less than one month after he met with BUSTAMANTE in Alabama – I believe that Individual K was a narcotics trafficker and the approximately $160,920 that Individual K delivered to BUSTAMANTE on May 14, 2019 were narcotics proceeds.

**10. BUSTAMANTE Attempts to Collect Approximately $101,000 of Narcotics Proceeds in Nashville on May 16, 2019.**

181. On or about May 15, 2019, at approximately 3:16 p.m. (TP7 Session 6540), BUSTAMANTE, using Target Phone 7, had a phone call with Individual M, who was using Individual M Phone 1. During this call, BUSTAMANTE stated, "Uh, on behalf of Abel [codename to vouch for trustworthiness]?" Individual M stated, "Yes, go ahead... Good. Are you coming to pick up [narcotics proceeds]?" BUSTAMANTE stated, "Yes, but not until tomorrow." Later during the conversation, Individual M stated, "It's for 100 [$100,000], right?" BUSTAMANTE responded, "Yes. Well, they didn't tell me how many units [how much currency BUSTAMANTE was supposed to collect]. You're the who [sic] is supposed to let me know."

105

182.  On or about May 16, 2019, at approximately 8:20 a.m. (TP7 Session 6702-04), BUSTAMANTE, using Target Phone 7, sent a text message to Individual M, who was using Individual M Phone 1.  In this message, BUSTAMANTE stated, "Good morning on behalf of Abel. I'm already in Nashville. ... At what time can we meet?"

183.  On the same day, at approximately 8:40 a.m. (TP7 Session 6707), BUSTAMANTE, using Target Phone 7, had a phone call with Individual M, who was using Individual M Phone 1. During this call, Individual M stated, "Give me like an hour to an hour and a half and I'll send you the location [for the money handoff]." BUSTAMANTE responded, "Gladly, I'll just grab some breakfast."

184.  On the same day, at approximately 9:43 a.m. (TP7 Sessions 6726-8), Individual M, using Individual M Phone 1, sent two text messages to BUSTAMANTE, using Target Phone 7.  In these messages, Individual M stated, "Exxon 1309 Murfreesboro Pike Nashville TN 37217 [money hand-off location]," and "En 20 minutes." The first text message also included a phone number for the Exxon and a link to it in Google Maps.

185.  At approximately 10:07 a.m. (TP7 Session 6734), BUSTAMANTE, using Target Phone 7, sent a text message to Individual M stating, "I'm here [the designated money hand-off location at an Exxon station in Nashville]."

186.  At approximately 10:02 a.m., agents observed an unknown male, later identified as Individual M, exit a residence in Nashville, carrying two boxes, and enter a red sedan.  Agents observed the red sedan drive in the direction of the Exxon

mobile described in the above conversations. Agents curbed the vehicle after observing a traffic violation near the Exxon, and the red sedan pulled into the Exxon's parking lot. During the stop, agents identified the driver and sole occupant of the car as Individual M. Individual M appeared nervous, apologized for not stopping at the stop sign, and could not produce a valid driver's license. Individual M gave consent to search the vehicle and agents recovered the two boxes, and observed a large amount of bundled United States currency on the passenger floorboard. Law enforcement found additional cash, similarly bundled, located within a box in the car. The total amount of currency was approximately $101,000. As a result of the traffic stop, BUSTAMANTE did not meet Individual M as planned to collect $101,000 in narcotics proceeds.

187. During a search of Individual M's phone, agents found some of the intercepted text messages between BUSTAMANTE, using Target Phone 7, and Individual M, described above. During a search of Individual M's residence, agents recovered, among other things, a money counter, a currency tester pen, and rubber bands. Based on my training and experience, I know that these items are often used by narcotics traffickers to verify the legitimacy of sale proceeds, and package the proceeds.

188. Based on my training, experience, and familiarity with this case, including prior and subsequent intercepted communications and surveillance, and the seizure of approximately $101,000 from Individual M and the subsequent seizure of approximately $311,980 from Wire Transfer Business A in Chicago, the day after

this planned meeting in Nashville; I believe that BUSTAMANTE (a) traveled to Nashville and the Exxon station identified by Individual M in an attempt to collect and launder approximately $101,000; (b) intended to deposit the narcotics proceeds that he collected from Individual M at the Wire Transfer Business A in Chicago; and (c) intended to both collect the money from Individual M and deposit that money at Wire Transfer Business A for the purpose of promoting the felonious buying and selling of narcotics, concealing the nature, source, and ownership of the money, or both.

### 11. BUSTAMANTE, with Assistance from OWEN, Deposits Narcotics Proceeds, including Proceeds Obtained from Individual K, at Wire Transfer Business A in Chicago (May 17, 2019).

189. On or about May 15, 2019, at approximately 8:14 p.m. (TP7 Session 6629), BUSTAMANTE, using Target Phone 7, had a phone call with OWEN, using Target Phone 8. During this call, BUSTAMANTE asked, "Hey, can you do me a favor? Can you help me find a train from Nashville [where he had planned to collect narcotics proceeds from Individual M] to Chicago after 5:00 p.m.?" OWEN responded, "From Nashville Tennessee to Chicago after 5 p.m.?" BUSTAMANTE stated, "Yeah, after 5:00." OWEN confirmed, "Okay, tomorrow?" BUSTAMANTE stated, "Uh, tomorrow Thursday. Yes." OWEN said, "Alright, I'll look and see if Amtrak goes out of... goes out of Nashville to Chicago." OWEN continued, "And, I'll send it to you."

190. On or about May 16, 2019, at approximately 2:10 p.m. (TP7 Session 6766), BUSTAMANTE, using Target Phone 7, spoke with OWEN, using Target Phone 8. During this call, OWEN stated, "You okay with the train and stuff, that's what I

was kinda really calling about." BUSTAMANTE responded, "Yeah, although I can't find the station." OWEN stated, "It said it was at the bus station, right?" BUSTAMANTE responded, "I don't think it's a bus station." OWEN responded, "Oh, you don't think it's at that bus station location? It has the address up at the top. Where it said it was coming from, but I don't know. I'm sure somebody will know."

191.    At approximately 2:17 p.m. (TP7 Session 6767), BUSTAMANTE, using Target Phone 7, had a conversation with an Amtrak employee regarding the purchase of a train ticket from Nashville, to Chicago. Amtrak informed BUSTAMANTE that he would have to take a bus from Nashville to Indianapolis, and then a train from Indianapolis to Chicago, which would arrive at 10:00 a.m. on May 17, 2019.

192.    On May 17, 2019, at approximately 10:08 a.m., surveillance observed BUSTAMANTE outside Union Station at 225 S. Canal Street in Chicago. Shortly thereafter, surveillance observed BUSTAMANTE travel to the Cermak Market on the 5200 block of South Pulaski Road in Chicago, enter the market carrying two backpacks (one black, and one black and brown), approach Employee A at Wire Transfer Business A within the market, and (after some conversation) hand the black and brown backpack to Individual A, who placed the bag in a safe marked "CSU30." BUSTAMANTE then left the store.

193.    Within approximately one hour after BUSTAMANTE left the Cermak Produce, agents interviewed Employee A. During this interview:

a.       As noted above, Employee A identified the man who had visited the store minutes earlier as "Erick." Employee A stated that, earlier that day, an

109

individual in Mexico whom she knew only as Oscar told her that "Erick [BUSTAMANTE] is coming to drop a package off." When Agents requested consent to search the safe, Employee A stated that she could not open the safe because it was controlled remotely by Oscar.

      b.    Employee A stated that she had worked at the wire transfer business for approximately three weeks and that during that time, "Erick" had visited the store and dropped off a package on three previous occasions. Each time, Employee A placed the packages into three separate safes, at the direction of Oscar LNU. As noted above, Employee A stated that on May 7, Employee A placed a bag into a safe marked CSU23 for BUSTAMANTE.

194. Agents viewed surveillance footage from the Cermak Market that showed the wire transfer business on both May 7 and May 17. The surveillance footage captured the following:

      a.    Minutes before BUSTAMANTE entered the wire transfer business on May 17, 2019, Individual A answered a cell phone and, during the call, the door on the same safe in which Individual A later placed BUSTAMANTE's black and brown backpack (CSU30) popped open.

      b.    As noted above, consistent with Individual A's account, BUSTAMANTE also entered the wire transfer business on May 7, 2019. The footage showed BUSTAMANTE enter the business and give a black bag to Individual A, who then placed the bag in one of the safes.

195. On or about May 17, 2019, Magistrate Judge Sidney I. Schenckier authorized a search warrant for Wire Transfer Business A, described above. Upon executing the search warrant, agents found, among other things: (1) located in a safe labeled "CSU 30," a black and brown backpack containing approximately $156,610 United States currency; (2) located in a safe labeled "CSU 26," a black plastic bag containing United States currency; (3) located in a safe labeled "CSU 10," a black garbage bag containing United States currency; and (4) located in a safe labeled "CSU 23," a black plastic bag containing United States currency. The total amount of currency located within the bags found within safes CSU 26, CSU 10, and CSU 23, was approximately $155,370; and together with the $156,610 found in safe CSU 30, BUSTAMANTE stored a total of approximately $311,980 at Wire Transfer Business A on May 17, 2019.

196. Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted communications, surveillance, and the seizure of approximately $100,000 from Individual M – I believe that (a) BUSTAMANTE collected approximately $160,920 in narcotics proceeds from Individual K in Alabama on May 14, 2019; (b) traveled from Alabama to Nashville where he unsuccessfully attempted to collect approximately $100,000 in narcotics proceeds from Individual M; and (c) transported the approximately $160,920 the he had obtained from Individual K to Chicago, where he left the money at the wire transfer business inside the Cermak Market for safe storage, along with other narcotics proceeds that he had previously left at the same business.

197. Also on or about May 17, 2019, Magistrate Judge Maarten Vermaat in the Western District of Michigan authorized a search warrant for Wire Transfer Business B, described above. Upon executing the search warrant, agents found, among other things: (1) located in a safe, approximately $65,700 wrapped in brown paper packaging; and (2) located in a safe, a white plastic bag containing approximately $114,850.

198. Based on my training and experience, and familiarity with this case – including prior and subsequent intercepted communications, surveillance, and the seizure of approximately $180,550 contained in the safes at Wire Transfer Business B, I believe that BUSTAMANTE on behalf of Lalo: (a) collected approximately $70,000 of narcotics proceeds from UM7-4174 in Boston on April 25, 2019; (b) traveled to Grand Rapids to deposit the approximately $70,000 of narcotics proceeds (less commission) at Wire Transfer Business B on April 27, 2019; (c) collected approximately $115,000 of narcotics proceeds in Detroit from UF7-5898 on May 13, 2019; and (d) traveled to Grand Rapids to deposit the approximately $115,000 of narcotics proceeds (less commission) at Wire Transfer Business B.

199. A couple of months after the seizures at Wire Transfer Business A and Wire Business B, on or about July 1, 2019, at approximately 12:24 p.m. (TP7 Session 10341), BUSTAMANTE, using Target Phone 7, had a phone conversation with UF7-10338. During this call:

a. BUSTAMANTE stated, "So I have clients that need to digitize funds, right? What does that mean? We take cash, we put it into the bank system,

and we try to do our due diligence as much as possible. I've been working with cannabis guys [traffickers] for over 3 years now." BUSTAMANTE continued, "So let's say that I need to take funds and put them into the bank system in North Carolina. But let's say that my account is in Chase. Well, all of the Carolinas do not have a Chase. So that means, I have to travel with the funds either with the client or by myself to where there is a Chase, or where there is a branch that will accept my funds in cash, okay?" BUSTAMANTE said, "So sometimes those trips are long, like 16 hours, 18 hours, okay? . . . But I do them in a particular way where no one knows where I am at." BUSTAMANTE said that he does not travel by plane because "there'll be a lot of flags and you know, I can carry up to 250,000 [$250,000 cash] on me."

b. BUSTAMANTE also described an incident that "had just happened in Chicago," referring to the DEA's execution of the search warrant at the Wire Transfer Business A in Chicago and seizure of approximately $156,610 in illicit proceeds that BUSTAMANTE had previously collected from Individual K in Alabama, as well as approximately $155,370 that BUSTAMANTE is believed to have deposited there on prior occasions. BUSTAMANTE stated, "So I go to one of the venues [Wire Transfer Business A], and I come out walking, mind you. I come out walking, and then all of a sudden I get a call saying, 'Hey, where you at?' 'Well, I'm here at the site. What's going on?' 'Oh, you might have a tail [law enforcement watching].' I'm like, 'I don't have a tail.' He goes, 'Yeah, check your phone.' So I check my phone, I check my GPS and everything is turned off. And the way, I do my trips it's, uh, kind of James Bond-ish [avoiding detection by law enforcement], because I

113

learned how to move around by myself, you know. And especially, when we are moving cash and things like that, right?"

    c.    BUSTAMANTE continued, "I go, 'Well, who is following me?' And all of a sudden they send me two pictures of these two white guys. I'm like, 'Dude, those are American. Our clients are Latin and Black. So, what's up?' He goes, 'Well, they are saying that they are from the DEA.'" BUSTAMANTE continued, "So I go, 'Okay, that's fine. Where do I have to go?' He goes, 'No, I think you should just cut out.' I'm like, 'Okay.' So I head over to the bank, to the airport, and at the airport I pass like normal. And I land in LAX and I go to where I need to go. So it was a little bit weird, because if they are like hunting you down, they are supposed to give out a BOLO [a notice issued law enforcement-wide to "Be On the Look Out" for a particular individual]. There was no BOLO [issued for BUSTAMANTE]."

    d.    BUSTAMANTE said that his contacts told him, "'Dude, I think this is someone that found out you were doing drops, or working for somebody else. But this does not seem like an agency [DEA] guys. Especially that particular agency. Unless they, someone pointed the finger and says, 'Well, Erick, is doing that.' So someone pointed the finger at you, or something that they don't know.'"

200.    Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded and intercepted conversations, prior surveillance, and the May 17 seizure of approximately $311,980 that BUSTAMANTE deposited at Wire Transfer Business A and the May 17 seizure of approximately $180,550 that BUSTAMANTE deposited at Wire Transfer Business B

– I believe that, during the above conversation over Target Phone 7, BUSTAMANTE (a) stated that he launders narcotics proceeds; (b) explained that he launders such proceeds by personally collecting cash proceeds throughout the United States and transporting those proceeds to the nearest available bank or money wire service that will accept deposit of the cash into one of his accounts; (c) acknowledged that he delivered the seizure of approximately $311,980 in narcotics proceeds that agents seized from Wire Transfer Business A on May 17, 2019; (d) advised UF7-10338 that he had assured the owners of the seized drug money that he did not have a "tail" and was not responsible for leading law enforcement to Wire Transfer Business A where the money was seized; (e) explained that he travels in a manner that allows him to avoid detection by law enforcement, including by avoiding air travel where the bulk currency he carries would be more vulnerable to discovery; and (f) understood the importance of avoiding law enforcement's detection of his financial transactions because he knew that the money that he collected and transferred were proceeds of narcotics and other illicit transactions.

201. On or about July 4, 2019, at approximately 1:11 p.m. (TP7 Session 10778), BUSTAMANTE, using Target Phone 7, had a phone conversation with OWEN, using Target Phone 8. During this conversation:

a. OWEN said, "I'm trying to figure out how to stop your buddy [Lalo] from calling me all the time." OWEN asked, "[W]hat's he keep texting me about?" BUSTAMANTE explained, "One of his guys in Philadelphia about a month and a half ago, 2 months now. Uh... made a drop. Oh, no. Went to go do a pick up and

as soon as he leaves the parking lot, he gets raided. They don't give him any paperwork, they don't give him a business card, don't give him anything. They just make him sign a waiver saying that he is willingly giving the property over to the, what they consider the feds. Later he gets a notice, which I have in my phone, saying that, 'Hey, you can reclaim your money but obviously you have to show proof of funds'... origin of funds, right?"

      b.    BUSTAMANTE continued, "And then thing is with [the execution of the search warrant at Wire Transfer Business A in] Chicago, I'm gonna send you through the other phone the warrant that they did in Grand Rapids [at Wire Transfer Business B]. But remember I went to Chicago [on May 17, 2019, when the search warrants were executed], I wasn't in Grand Rapids." BUSTAMANTE said, "That same day they raided Grand Rapids, that office. . . . So, I think they were always scoping out Grand Rapids because the guy can't give us any proof of anything that happened in Chicago." BUSTAMANTE said, "But apparently, according to their attorney both places got raided. So, they're just trying to see if they can get the money back and go from there. But like I told Lalo, I don't think people are trying to follow me."

    202.    Based on my training, experience, and familiarity with this case – including prior and subsequent consensually recorded and intercepted conversations, prior surveillance, and the May 17 seizure of approximately $311,980 that BUSTAMANTE deposited at Wire Transfer Business A and the May 17 seizure of approximately $180,550 that BUSTAMANTE deposited at Wire Transfer Business B

– I believe that, in the above conversation, BUSTAMANTE acknowledged that he deposited narcotics proceeds on behalf of Lalo at Wire Transfer Business A on May 17, 2019; that the deposits of narcotics proceeds at Wire Transfer Business A and Wire Transfer Business B were both on behalf of Lalo; and BUSTAMANTE assured Lalo that he didn't believe that BUSTAMANTE himself was being followed by law enforcement.

### H.     The BUSTAMANTE MLO Laundered Approximately $4,356,909 in Illicit Proceeds between August 2017 and May 2019

203.   The BUSTAMANTE MLO laundered a total of approximately $4,356,909 in illicit proceeds between August 2017 and May 2019.

204.   More specifically as described in more detail above:

a.     Between August 30, 2017 and March 5, 2019, the BUSTAMANTE MLO laundered approximately $2,934,910 using Company A Bank Account 1.

b.     Between January 2018 and May 2018, the BUSTAMANTE MLO laundered approximately $218,641 using BARTON Chase IOLTA Account 1.

c.     In May 2018, the BUSTAMANTE MLO laundered approximately $231,720 using the BARTON Chase IOLTA Account 2.

d.     Between June 2018 and May 2019, the BUSTAMANTE MLO laundered approximately $266,400 using BARTON's Huntington IOLTA Account.

e.     On or about April 17, 2019, the BUSTAMANTE MLO laundered approximately $94,000 using the UC Bank Account.

117

f. Between April 2019 and May 2019, the BUSTAMANTE MLO laundered approximately $491,980 using Wire Transfer Business A and Wire Transfer Business B.

205. Additionally, between September 2018 and December 2018, the BUSTAMANTE MLO laundered approximately $57,143 using a business checking account held at Huntington Bank in the name of BARTON Law Firm LPA, account ending in 8931.

206. Additionally, between March 2019 and May 2019, the BUSTAMANTE MLO laundered approximately $62,115 using a business checking account held at Huntington Bank in the name of Compliance Paymaster, LLC, account ending in 9283, controlled by BARTON.

## III. CONCLUSION

207. Based on the foregoing, I respectfully submit that there is probable cause to believe that beginning in or about August 2017, and continuing until at least in or about May 2019, ERICK BUSTAMANTE, RICK OWEN, and JERY BARTON, together with others known and unknown, together with others known and unknown, conspired to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, namely, the delivery of quantities of United States currency to third parties, which transactions involved the proceeds of specified unlawful activity, namely the felonious buying and selling and otherwise dealing in a controlled substance, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting

118

and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), all in violation of Title 18, United States Code, Section 1956(h).

FURTHER AFFIANT SAYETH NOT.

_____

Joseph Dinaso
Special Agent
Drug Enforcement Administration


SUBSCRIBED and SWORN to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 20th day of September, 2019.

_____
JEFFREY T. GILBERT
United States Magistrate Judge

119